821 A.2d 62

**MOTOR VEHICLE ADMINISTRATION**

**v.**

**Michael Patrick LYTLE.**

**No. 68, Sept. Term, 2002.**

Court of Appeals of Maryland.

April 8, 2003.

38

40

Leight D. Collins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen of MD, on brief), Glen Burnie, for petitioner.

Michael Patrick Lytle, Pasadena, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and LAWRENCE F. RODOWSKY (retired, specially assigned), JJ.

HARRELL, Judge.

## I.

■ Respondent in this case, Michael Patrick Lytle, was arrested for Driving While Intoxicated (DWI) and administered a breathalyzer test. The relevant statutory provisions establish a rebuttable presumption that the test results generated by certain breath test instruments administered by trained test technicians are accurate. That presumption may

be rebutted at an administrative evidentiary hearing by a showing that the specific instrument used to measure the subject's breath was malfunctioning at the time of testing or that human error caused the test to generate an inaccurate result. Respondent offered no evidence or arguments on either score before an Administrative Law Judge ("ALJ") of the Maryland Office of Administrative Hearings ("OAH"). Instead, he claimed generally that the type of machine used, the Intox EC/IR, had a plus or minus 0.01 range of accuracy and that that margin of error must be applied to his case, yielding a blood alcohol content ("BAC") measurement below the then prevailing 0.10 benchmark for DWI. The specific issue before us is whether a general "margin of error" of the "accepted scientific range of accuracy" of the type of test instrument used must be applied to certified test results produced by a specific Intox EC/IR machine in a prima facie case of violating Maryland Code, Title 16, § 16–205.1(f)(8)(i)(4)(B).

### A.

The Transportation Article of the Maryland Code, Title 16 (Vehicle Laws—Driver's Licenses), Subtitle 2 (Cancellation, Refusal, Suspension, or Revocation), §§ 16–201—213 (1977, 1999 Repl.Vol. and 2000 Supp.),[1] § 16–205.1(b)(2) provides that

> ... if a police officer stops or detains any person who the police officer has reasonable grounds to believe is or has been driving or attempting to drive under the influence of alcohol ... the police officer shall: (i) Detain the person; (ii) Request that the person permit a test to be taken; and (iii) Advise the person of the administrative sanctions that shall be imposed for refusal to take the test, ....

---

1. All references to the Maryland Code are to the 1999 Replacement Volume of the Transportation Article and the 2000 Supplement unless otherwise indicated. The statute at issue was amended in 2001 to substitute "0.08" for "0.10." Chapters 4 and 5, Acts 2001, effective 30 September 2001. Otherwise, the statute remains substantively the same.

The type of testing authorized under § 16–205.1 is a test of breath or, under limited exceptions, a blood test to determine alcohol concentration. § 16–205.1(a)(1)(iv). When the test is administered, the toxicologist's reporting protocol is to reduce the readings of the test instrument to a reported result. The "test result" is generated when the operator takes the lowest of two or three readings and records the lowest result after it is rounded down to the second decimal place. Regulations of the State Toxicologist, Amendment 1, Section C(5) (1999). When a test results in a BAC of 0.10 or more at the time of testing, the police officer administering the test "shall . . . personally serve an order of suspension on the person." § 16–205.1(b)(3)(ii). The police officer then must send a sworn statement to the Motor Vehicle Administration (MVA) within seventy-two hours stating that the person submitted to the test and that the test indicated an alcohol concentration of 0.10 or more at the time of testing. § 16–205.1(b)(3)(vii)(2). Under the statute, the sworn statement of the test technician or analyst is prima facie evidence of a test result of 0.10 or more. § 16–205.1(f)(7)(ii). The Intox EC/IR test machine is a "reliable indicator of the alcohol concentration of a person," pursuant to the Code of Maryland Regulations ("COMAR") 11.11.03.08B(6).

The Transportation Article authorizes tests "subject to the provisions of §§ 10–302 through 10–309, inclusive, of the Courts and Judicial Proceedings Article." § 16–205.1(f)(8)(i)(4)(B). Sections 10–304(a)(3) and (b) of the Courts and Judicial Proceedings Article of the Maryland Code require tests to be administered with "equipment approved by the toxicologist under the Postmortem Examiners Commission" and by a "qualified person" who "has received training in the use of the equipment in a training program approved by the toxicologist." The protocols for testing procedures and the equipment approved by the toxicologist are contained in the Regulations of the Toxicologist ("Toxicologist's Regulations").[2]

---

**2.** Regulations of the Toxicologist, Post Mortem Examiners Commission, State of Maryland, Regarding Tests of Breath and Blood for Alcohol

The accuracy of the breath test instruments is monitored both through diagnostic maintenance performed at least monthly on the Intox EC/IR test machine and through an internal standard test that is run before and after the administration of each test. Toxicologist's Regulations, Sections IIE, IIIC(3), Amendment 1, Section C(3). The monthly diagnostic test is conducted using a test solution that is 0.10% alcohol content. The results of the test must be between 0.095% and 0.105% or the test instruments must be removed from use until they are repaired to meet the required tolerance. Toxicologist's Regulations, Section IIA(7). The test instrument itself runs an internal standard test, generating an "STD" reading, at the beginning and end of each test. A valid test yields an STD reading between 0.090 and 0.110 pursuant to the regulations. Toxicologist's Regulations, Amendment 1, Section C(3).

The person subject to detention may request an administrative hearing at the time his license is suspended or within a specified period thereafter. § 16–205.1(b)(3)(v).[3] If the person

---

adopted October 1, 1995, as amended October 1, 1999. The Regulations were issued in 1983 and were reissued in 1990, 1995, and 2001 with amendments. The Regulations are appended to the Maryland DWI manual prepared by the Maryland State Police. We have appended the regulations to our opinion.

The Toxicologist's Regulations are significant by virtue of § 16–205.1(a)(2) which provides "[a]ny person who drives or attempts to drive a motor vehicle on a highway ... is deemed to have consented, subject to the provisions of §§ 10–302 through 10–309 inclusive, of the Courts and Judicial Proceedings Article, to take a test if the person should be detained on suspicion of driving ... while intoxicated." Sections 10–304(a)(3) and (b) of the Courts and Judicial Proceedings Article require tests to be administered with "equipment approved by the toxicologist under the Postmortem Examiners Commission," and by a "qualified person" who "has received training in the use of the equipment in a training program approved by the toxicologist."

3. A temporary license is issued allowing the person to continue driving for forty-five days after the order of suspension is issued. If a hearing is requested at the time the order is issued or within ten days of issuance then a hearing is scheduled within forty-five days. The person is allowed to request a hearing within thirty days of issuance of the order but in that instance the forty-five day temporary license will not be renewed or extended to account for the pending hearing. See § 16–205.1(b)(3)(v)(1) and (2).

does not request an administrative hearing, then a sanction is imposed on the forty-sixth day after issuance of the order of suspension. A test result indicating an alcohol concentration of 0.10 or more at the time of testing requires imposition of a forty-five or ninety day suspension of the driver's license, depending on the number of prior offenses. § 16–205.1(b)(1)(i) and (ii). If there is an administrative hearing, the issues to be adjudicated are circumscribed by § 16–205.1(f)(7)(i):

1. Whether the police officer who stops or detains a person had reasonable grounds to believe the person was driving or attempting to drive while intoxicated, while under the influence of alcohol, while so far under the influence of any drug, any combination of drugs, or a combination of one or more drugs and alcohol that the person could not drive a vehicle safely, while under the influence of a controlled dangerous substance, in violation of an alcohol restriction, or in violation of § 16–813 of this title;

2. Whether there was evidence of the use by the person of alcohol, any drug, any combination of drugs, a combination of one or more drugs and alcohol, or a controlled dangerous substance;

3. Whether the police officer requested a test after the person was fully advised of the administrative sanctions that shall be imposed, including the fact that a person who refuses to take the test is ineligible for modification of a suspension or issuance of a restrictive license under subsection (n)(1) and (2) of this section;

4. Whether the person refused to take the test;

5. Whether the person drove or attempted to drive a motor vehicle *while having an alcohol concentration of 0.10 or more at the time of testing;* or

6. If the hearing involves disqualification of a commercial driver's license, whether the person was operating a commercial motor vehicle.

(Emphasis added.) The sworn statement of the test technician is prima facie evidence of a test result of 0.10 BAC or more. The person contesting the test instrument reading may

submit evidence that the test instrument used to measure his or her breath was "malfunctioning at the time of testing, or that human error caused the test to be inaccurate." COMAR 11.11.03.08B(7). The Code of Maryland Regulations, 11.11.03.08B(5)–(7) (Hearings, Evidence), promulgated pursuant to § 12–104(b), provided in relevant part:

(5) For the purpose of determining the accuracy of the test result indicating the alcohol concentration of the licensee, the following breath testing instruments shall be deemed reliable indicators of the alcohol concentration of a person:

(a) Breathalyzer Model 900;

(b) Breathalyzer Model 900A;

(c) Intoximeter 3000; and

(d) Intox EC/IR.

(6) There shall be a rebuttable presumption that the test result of a test of blood or breath indicating the alcohol concentration of the licensee is accurate.

(7) The reliability of breath testing instruments approved in § B(5) of this regulation and the presumption established in § B(6) of this regulation may not preclude a licensee from demonstrating that the specific breath testing instrument used to test the alcohol concentration of the licensee was malfunctioning at the time of testing, or that human error caused the test result to be inaccurate.

### B.

Lytle was stopped by Officer Dickey of the Anne Arundel County Police Department at approximately 10:50 p.m. on 11 March 2001 after the officer paced him traveling 70 m.p.h. in a posted 55 m.p.h. zone and watched him cross the shoulder lane marker five times and the center line four times. After stopping Lytle's vehicle, Officer Dickey noticed the smell of alcohol emanating from Lytle's breath. The officer administered the Horizontal Gaze Nystagmus test to Lytle who displayed six clues of intoxication. Officer Dickey then administered two additional field sobriety tests to Lytle who dis-

played four signs of intoxication on the walk and turn test and three signs of intoxication on the one leg stand test. A preliminary breath test was administered and Lytle was arrested for driving while intoxicated and driving under the influence of alcohol.

After arresting Lytle, Officer Dickey requested another breathalyzer test which resulted in a reading of 0.101 grams of alcohol per 210 liters of breath. A second test administered by the officer yielded a 0.105 reading. Consequently, Officer Dickey issued a Certification and Order of Suspension to Lytle.

On 14 March 2001, Lytle requested a hearing before the OAH. The hearing was held before an ALJ on 12 June 2001. The Motor Vehicle Administration ("MVA") appeared at the hearing through its paper record of the certified test results. At the hearing, Lytle made a Motion for No Action and argued that the test result of 0.10 should be reduced below 0.10 because of the permissible variance of such test results arguably recognized in the Toxicologist's Regulations. The ALJ took the matter *sub curia* and granted Lytle ten days in which to file a Memorandum of Law supporting his position.

Lytle postulated in his memorandum that the test results of 0.10 are insufficient to show that he was subject to the sanctions of § 16–205.1(b)(1). Section 16–205.1(b)(1) provides in relevant part:

(1) Except as provided in subsection (c) of this section, a person may not be compelled to take a test. However, the detaining officer shall advise the person that, on receipt of a sworn statement from the officer that the person was so charged and refused to take the test, or was tested and the result indicated an alcohol concentration of 0.10 or more, the Administration shall:

(i) In the case of a person licensed under this title:

1. For a test result indicating an alcohol concentration of 0.10 or more at the time of testing:

A. For a first offense, suspend the driver's license for 45 days; . . .

Lytle argued that the "accepted scientific range of accuracy" for breath test results as stated in the Toxicologist's Regulations is plus or minus 0.01.[4] Lytle contended therefore that his test results must be reduced by 0.01 to yield a result of 0.09, thus rendering the sanctions of § 16–205.1(b)(1) inapplicable.

Relying on cases from other states, Lytle observed that some require particular test results as a basis for sanction and others require a specific alcohol content before sanctions may be imposed. Lytle contended that Maryland law required that sanctions be imposed based on a specific alcohol content and not a particular test result, and therefore he was entitled to the benefit of the margin of error.

On 20 June 2001, the ALJ issued an opinion concluding, as a matter of law, that the MVA failed to prove by a preponderance of the evidence that Lytle had an alcohol concentration of 0.10 or greater at the time of testing. The ALJ's reasoning began with the premise that the statute was written using the "alcohol content" standard. Noting that the language of § 16–205.1(b)(1), "or was tested and the result indicated an alcohol concentration of 0.10 or more," contained references both to the "test result" and "alcohol content" standards, the ALJ relied on § 16–205.1(f)(7)(i)(5) to reason that the Legislature intended the statute to employ the "alcohol content" standard. Relying on § 16–205.1(f)(7)(i), enumerating the issues that could be raised at an administrative hearing, and specifically § 16–205.1(f)(7)(i)(5), the ALJ emphasized that the test was: "[w]hether the person drove or attempted to drive a motor vehicle while having an *alcohol concentration* of 0.10 or more at the time of testing." (Emphasis added.) The administrative adjudicator rationalized that the exclusion of test result language from the statement of issues that could be raised at an administrative hearing indicated the Legislature's intent to

---

4. The Toxicologist's Regulations state in this regard that: "No scientific measurement is unequivocally precise. All such measurements have an accepted scientific range of accuracy. For the breath and blood tests for alcohol content, the accepted scientific range of accuracy is plus or minus 0.01 of the reported result."

use alcohol content as the applicable standard. On this foundation, the ALJ concluded that it would "be patently unfair as well as a violation of due process not to consider and apply the margin of error, i.e. the accepted scientific range of accuracy, in [Lytle's] case." Furthermore, he concluded, again as a matter of law, that "[t]he MVA has not shown by a preponderance of the evidence, that the margin of error or the accepted scientific range of accuracy was factored into the calculation of the alcohol content of Mr. Lytle's breath," and therefore the MVA failed to prove that Lytle "drove or attempted to drive a motor vehicle 'while having an alcohol concentration of 0.10 or greater at the time of testing'" as required by § 16-205.1(f)(7)(i)(5). The ALJ ordered that "no action" be taken against Lytle.

On 9 August 2001, the MVA filed a Petition for Judicial Review with the Circuit Court for Anne Arundel County, pursuant to Maryland Code (1984, 2000 Repl.Vol.), State Government Article, § 10-222 ("the State Administrative Procedure Act"). The Circuit Court was asked to consider whether the ALJ erred when he took into account the margin of error in establishing the accurate level of Lytle's BAC breath result. Lytle reiterated in the Circuit Court the arguments he presented in the administrative proceeding. The MVA, now represented by counsel, argued that it was authorized to suspend a driver's license based on a certified test result and was not required to litigate proof of an actual breath alcohol content level. The court affirmed the decision of the ALJ.

The Circuit Court, like the ALJ, was unable to find any Maryland case law providing guidance on the issue. The court relied upon an Alaska case urged by Lytle. In *Haynes v. Alaska*, 865 P.2d 753 (Alaska 1993), the Alaska Supreme Court held that the failure to apply the margin of error inherent in the type of testing device in favor of the person subject to license revocation was a violation of the due process rights afforded by both the federal and Alaska constitutions. The Circuit Court, agreeing with the analysis of the Alaska court, concluded that the margin of error "must be applied

when determining the somewhat strict statutory standard of license revocation."

The MVA petitioned this Court to grant a writ of certiorari. We granted the petition to consider whether a certified and unrebutted 0.10 test result from a chemical breath test for alcohol was sufficient evidence of an alcohol concentration of 0.10 or more mandating a driver's license suspension under the administrative per se provisions of § 16-205.1. 371 Md. 261, 808 A.2d 806 (2002).

## C.

The MVA argues here that the language of § 16-205.1, and its related legislative history as well as that of the statutory scheme of which it is a part, authorize the MVA to impose license suspensions based solely on certified test results. The MVA further contends, as a matter of law, that it proved Lytle's blood alcohol concentration inasmuch as he failed to submit any competent evidence to overcome the rebuttable presumption that the certified 0.10 test result in his case was accurate.

The MVA maintains that a reading of the plain language of the statute and consideration of the overall statutory scheme reveal that § 16-205.1 is a "test result" statute. The MVA reminds us that, to interpret Maryland's motor vehicle laws, we must "ascertain and effectuate the intent of the legislature" in a reasonable statutory construction that is consistent with the "purpose, aim or policy of the legislature reflected in the statute." *MVA v. Gaddy*, 335 Md. 342, 346–47, 643 A.2d 442, 444 (1994). The ALJ's interpretation of § 16-205.1 was incorrect therefore because his interpretation failed to construe subsection (f)(7)(i)(5) as part of a statutory scheme. Subsection (f)(7)(i), permitting challenge of "[w]hether the person drove or attempted to drive a motor vehicle while having an alcohol concentration of 0.10 or more at the time of testing" at an administrative hearing, must be read together with subsection (f)(7)(ii), establishing that "[t]he sworn statement of the police officer . . . shall be prima facie evidence of a

test refusal or a test resulting in an alcohol concentration of 0.10 or more at the time of testing," to discern more accurately the legislative intent. When the two subsections are considered in tandem, the MVA suggests, it becomes clear that the Legislature intended a certified test result to be presumptive proof of a 0.10 BAC.

The MVA continues that the design of the § 16–205.1 administrative process reflects the Legislature's intent to sanction drunk drivers based on test results. The purpose of the administrative per se provisions were to create an administrative system that would take "swift and certain action against drunk drivers." Based upon recommendations of the Task Force on Drunk and Drugged Driving ("Task Force"), the Legislature rewrote § 16–205.1 in 1989 to create a new administrative system governing suspension of drivers licenses. *See* House Bill 556, 1989 Md. Laws ch. 284, § 1. One of the Task Force's recommendations was to create an "administrative per se law" providing for the prompt suspension of a driver's license belonging to a drunk driving suspect who "[s]ubmitted to the BAC test, and the results exceeded a statutorily defined limit." *MVA v. Shrader*, 324 Md. 454, 460, 597 A.2d 939, 941–42 (1991). One of the purposes of the new statute, as declared in an amendment to the preamble of House Bill 556, was "establishing *certain sanctions for certain test results.*" (Emphasis added.) The statute was amended to create mandatory sanctions imposed "when the driver takes a test to determine alcohol concentration and fails the test." *Embrey v. MVA,* 339 Md. 691, 698, 664 A.2d 911, 914 (1995).

The MVA also finds significant the Legislature's failure to incorporate proposed amendments that would have allowed drunk driving suspects to conduct a mini-trial at their administrative hearings. The Legislature refused to adopt amendments which would have allowed a driver to compel attendance of the police officer or test technician at the hearings and, instead, retained the nature of an administrative per se hearing as one where "a sworn statement is prima facie evidence of a violation of § 16–205.1." The MVA asserts that the Legislature, in the formulation of the regulatory scheme, must have

accounted for the accepted scientific range of accuracy of the approved breath testing instruments as the Legislature "is presumed to have had, and acted with respect to, full knowledge and information as to prior and existing law and legislation on the subject of the statute and the prior law." *City of Baltimore v. Hackley,* 300 Md. 277, 283–84, 477 A.2d 1174, 1177 (1984). The MVA also suggests that the Task Force heard testimony on the accuracy of breath testing machines such that it naturally follows that the Legislature was "well versed" in the accuracy of breath test machines when it nonetheless created the administrative per se law.

As noted *supra,* Lytle did not submit any evidence before the OAH to controvert the MVA's certified test results, choosing instead to challenge the statutory procedure for calculating a certified test result. By relying on the Toxicologist's Regulations, so the MVA's argument goes, both Lytle and the ALJ acted improperly because there is no "statute that authorizes the toxicologist to establish evidentiary presumptions or to allocate the burdens of production and persuasion at an MVA suspension hearing." *Borbon v. MVA,* 345 Md. 267, 275, 691 A.2d 1328, 1332 (1997).

Not only was it improper to rely on the Toxicologist's Regulations as a source of authority, the ALJ misapplied those regulations. The MVA contends that the regulations do not support reducing Lytle's test result by 0.10. The toxicologist already had taken into account the general scientific accuracy of the test in his reporting protocol by, first, taking the lowest of two or three readings as the "test result;" and, second, reporting the lowest test result only after it is rounded down to the second decimal place. Thus, the standards contained in the Toxicologist's Regulations support the accuracy of the Intox EC/IR test instrument and therefore do not provide a basis for impeaching Lytle's test results. The MVA concludes, therefore, that the ALJ misinterpreted the accepted scientific standards to reach his result and acted outside the scope of his authority by disregarding the statutory prima facie case.

Lytle, in addition to maintaining his earlier arguments, contends that the MVA's appellate arguments were waived and are not properly before this Court because they were not raised at the administrative hearing. Lytle argues that because the MVA appeared at the administrative hearing only through its paper test results and did not present any arguments, the arguments the MVA now makes before this Court are waived based on our decision in *Brodie v. MVA,* 367 Md. 1, 785 A.2d 747 (2001) (stating that "in an action for judicial review of an agency's decision, ordinarily, a reviewing court may not pass upon issues presented to it for the first time on judicial review and that are not encompassed in the final decision of the administrative agency").

If the merits need to be reached, the decision of the ALJ, as Lytle sees it, is presumptively valid and must be reviewed in a light favorable to him. *See Mehrling v. Nationwide Ins. Co.,* 371 Md. 40, 65, 806 A.2d 662, 677 (2002); *Young v. Anne Arundel County,* 146 Md.App. 526, 568–69, 807 A.2d 651,(2002). As to the language of the statute, he contends that it focuses on alcohol content and not test results. Lytle suggests that if § 16–205.1 permits him to challenge the "alcohol concentration of 0.10 or more at the time of testing," acceptance of the MVA's contention that the Legislature intended reliance solely on the "certified test results" would "ameliorate" this right. Such an interpretation of the competing clauses would render one of them "superfluous, meaningless, or nugatory." In order to "harmonize" the relevant provisions of the statute, he urges that it must be interpreted as favoring alcohol concentration and not test results. Referring to portions of the Floor Report, Senate Judicial Proceedings Committee, House Bill 556 (1989), stating that the proposed administrative per se law requires imposition of sanctions when "the person takes the test and has a blood alcohol concentration of 0.10 or greater," Lytle interprets that to mean that the Legislature intended the statute to be an "alcohol content" statute. Further supporting his interpretation, Lytle points to a statement from the preamble of Senate Bill 108 and House Bill 3 of the 2001 Session of the

Maryland General Assembly (2001 Md. Laws ch. 4 & 5) which lowered the alcohol concentration threshold to 0.08: "For the purpose of ... reducing the level of alcohol concentration for a certain administrative offense that results in the suspension of a driver's license under certain circumstances." On the basis of this, Lytle concludes that the amended statute is an alcohol content statute and states that "it strains the imagination to believe that in 1989 the legislature intended for 'test results' to be the standard, and then in 2001, without discussion, it changed its mind and made 'alcohol concentration' the standard."

Lytle claims case law support from other jurisdictions. In addition to the Alaska case discussed *supra,* he finds succor from Nebraska, *Nebraska v. Bjornsen,* 201 Neb. 709, 271 N.W.2d 839 (1978); Washington, *Washington v. Keller,* 36 Wash.App. 110, 672 P.2d 412 (1983); Ohio, *Ohio v. Prestier,* 7 Ohio Misc.2d 36, 455 N.E.2d 24 (1982); and Hawaii, *Hawaii v. Boehmer,* 1 Haw.App. 44, 613 P.2d 916 (1980). These cases, he contends, require the application of the scientific margin of error to test results produced by breathalyzer instruments, absent statutory direction to the contrary.

Finally, Lytle observes that he has a property right in his driving privilege that may not be suspended without the protections of due process. He argues that the second of three factors applicable to administrative procedural due process analysis under *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976), "the risk of erroneous deprivation of such [property] interest through the procedure used," is violated, and consequently he is deprived of his property right, when the results of the Intox EC/IR test are used without taking into account the 0.01 margin of error.

In its Reply Brief, the MVA argued that Lytle is incorrect to assert that failure to apply the margin of error test is a violation of his due process rights. Procedural due process requires "only that a licensee be informed of the evidence on which the agency is relying and be given a chance to rebut such evidence." *Plumer v. Maryland,* 915 F.2d 927, 931 (4th

Cir.1990). The use of a certified test result does not deny Lytle a meaningful hearing in the constitutional sense because he had the opportunity to testify and otherwise attempt to rebut the test result at his administrative hearing. The MVA asserts that this Court, in *Moon v. State*, 300 Md. 354, 478 A.2d 695 (1984), condoned the Legislature's declaration that breath test results are reliable evidence and therefore the suspension of driver's licenses based upon certified test results satisfies the constitutional requirement that the statutory scheme be free from unwarranted risk of an erroneous outcome.

In reply to Lytle's waiver argument, the MVA asserts that its right to judicial review is preserved because it is a party aggrieved by the ALJ's decision. The errors of law urged by the MVA for appellate review are "expressly 'encompassed in the final decision' of the ALJ." *Brodie*, 367 Md. at 4, 785 A.2d at 749. It was appropriate for the MVA to appear at the hearing on its paper submission because hearings under § 16–205.1 were intended by the Legislature to be "informal and summary in nature," *MVA v. Richards*, 356 Md. 356, 377, 739 A.2d 58, 70 (1999), and "permit the MVA's case to be made in most instances from a documentary record." *Borbon*, 345 Md. at 283, 691 A.2d at 1336. The MVA submitted a prima facie case to the ALJ when it submitted the certifications of the police officer and the test operator.

## II.

### A.

 Lytle is incorrect in his assertion that the MVA is not entitled to have this Court consider its arguments. The State APA, § 10–222(a)(1), provides that "a party who is aggrieved by the final decision in a contested case is entitled to judicial review of the decision." Section 10–222(f)(1) provides that "judicial review of disputed issues of fact shall be confined to the record." The dispute in this case is purely one of law. The MVA asks us to determine whether a certified, unrebutted 0.10 test result from a chemical breath test for alcohol is

sufficient evidence of an alcohol concentration of 0.10 or more mandating a driver's license suspension under the administrative per se provisions of § 16–205.1. Our conclusion will be reached by determining the legislative intent and interpreting the relevant statutory provisions. The grounds relied on by the agency are identical to the issues the MVA raises here. The ALJ determined that the statute required consideration of the margin of error because the statute is a "alcohol content" statute and the MVA argues before us that the statute does not require consideration of the margin of error because it is a "test result" statute. The MVA's arguments are properly before this Court.

## B.

A court reviewing a decision of an administrative agency [5] generally is limited to determining whether there was substantial evidence on the record as a whole to support the agency's findings of fact and whether the agency's conclusions of law were correct. *MVA v. Atterbeary*, 368 Md. 480, 490–91, 796 A.2d 75, 81–82 (2002). To determine whether an agency's decision is supported by substantial evidence the reviewing court must exercise deference towards an agency's fact-finding and determine only "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 68, 729 A.2d 376, 380 (1999) (quoting *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 512, 390 A.2d 1119, 1123 (1978)). We further noted that "[e]ven with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency," and "an administrative agency's interpretation and application of the statute which the agency

---

5. The MVA has delegated to the OAH in cases such as the present one the responsibility to conduct the evidentiary hearing and render the final administrative decision of the agency. COMAR 11.11.02.07 and .08(A). The MVA, however, may obtain judicial review of its own decision, thus made, if it is aggrieved by the decision rendered in its name by the OAH and was a party to the administrative proceeding. State APA, § 10–222(a)(2).

administers should ordinarily be given considerable weight by reviewing courts." *Banks,* 354 Md. at 69, 729 A.2d at 381. The issue in the present matter, the interpretation of § 16–205.1, presents a pure question of law. *See* Maryland Code (1984, 1999 Repl.Vol.), State Gov't Article, § 10–222(h)(3).

## C.

▮▮▮▮▮▮ The result in this case turns on the intent of the Legislature. Our analysis begins with the language of the statute as the primary source of legislative intent. When the language is clearly consistent with the apparent purpose of the statute and the result is not absurd, we have held that no further inquiry into legislative intent is required. *See Whiting–Turner Contracting Co. v. Fitzpatrick,* 366 Md. 295, 301, 783 A.2d 667, 670 (2001); *Degren v. State,* 352 Md. 400, 417, 722 A.2d 887, 895 (1999). Beyond plain meaning, the purpose of the statute may be ascertained by examining the Legislature's statement of a statute's purposes, and courts may consider other "external manifestations" or "persuasive evidence" indicating the legislative intent. *State v. Jones,* 340 Md. 235, 262, 666 A.2d 128, 141 (1995); *Eldridge v. State,* 329 Md. 307, 312, 619 A.2d 531, 534 (1993). The language of a statute cannot be divorced from its context. *Atkinson v. State,* 331 Md. 199, 212, 627 A.2d 1019, 1025 (1993). As we stated in *Kaczorowski v. Mayor and City Council of Baltimore,* 309 Md. 505, 514, 525 A.2d 628, 632 (1987), even where the language of the statute is plain, its meaning is controlled by its context. In short, the statutory language must be construed in light of and governed by its context within the overall statutory scheme. *In re Keith G.,* 325 Md. 538, 542, 601 A.2d 1107, 1109 (1992). An appellate court may consider evidence such as a bill's title and function paragraphs, amendments that occurred as it passed through the Legislature, and its relationship to earlier and subsequent legislation to ascertain the Legislature's goal in enacting the statute. *Harris v. State,* 331 Md. 137, 146, 626 A.2d 946, 950 (1993).

Lytle argues that the language of § 16–205.1 is ambiguous and that recourse to the legislative history reveals that the statute was intended to be an "alcohol content" statute, rather than a "test result" statute. He supports his argument primarily on the basis that if the statute were construed that "test results" triggered sanctions under § 16–205.1, it would render the language of § 16–205.1(f)(7)(i)(5) "superfluous, meaningless, or nugatory." Lytle also uses portions of the Floor Report regarding H.B. 556 of 1989 to support his argument, in particular a passage stating:

> [t]his bill adopts an 'administrative per se' law requiring the suspension of an individual's driver's license if the person is detained by police for driving or attempting to drive while intoxicated ... and the person: (1) refuses to take the test ...; or (2) the person takes the test and has a blood alcohol concentration of 0.10 or greater.

Lytle's reliance on the Floor Report is misplaced. The excerpt he relies on does not state that a person's license will be suspended based on his alcohol content; rather it provides that suspension will occur on the basis of a test result indicating a certain level of BAC. The emphasis is on the BAC, but only as measured by the test instrument. Lytle's fixation on the language contained in § 16–205.1(f)(7)(i)(5), "[w]hether the person drove or attempted to drive a motor vehicle while having an alcohol concentration of 0.10 or more at the time of testing," focuses on a discrete portion while ignoring its overall context. The phrase "at the time of testing" would be surplusage if alcohol content was determinative. If alcohol content was determinative, the statute would use the words "alcohol content," instead of "alcohol concentration." Blood alcohol concentration is a specific term of measurement and use of that term refers to test results rather than the alcohol content of the person's blood stream.

Our examination of the pertinent statutory language, its place in the statutory scheme, and even the relevant legislative history reveals a result opposite that reached by Lytle. Lytle's argument is based on snippets of language shorn from their contextual roots. It is clear that the Legislature intend-

ed to create an administrative per se law imposing "certain sanctions for certain test results." The stated purpose of the statute and the deliberate crafting of the regulatory scheme indicate that the statute was intended to create expedient procedures that swiftly would impose penalties for drunk driving irrespective of any parallel potential criminal processes or penalties. To this end, Petitioner correctly observes that the Legislature created an administrative system that focused on test results as a basis for sanctions.

The administrative procedures promulgated by the MVA pursuant to § 12–104(b) emphasize the purposes of the overall statutory scheme that includes § 16–205.1. The Code of Maryland Regulations establishes extensive procedures for checking the accuracy of the test instruments employed to implement § 16–205.1. The administrative procedures and instrument maintenance guidelines further demonstrate the intent that the swift and certain action taken be predicated on test results. Sections 16–205.1(f)(7)(i) and (ii) are self-evident of this:

(7)(i) At a hearing under this section, the person has the rights described in § 12–206 of this article, *but at the hearing the only issues shall be:*

1. Whether the police officer who stops or detains a person had reasonable grounds to believe the person was driving or attempting to drive while intoxicated, while under the influence of alcohol, while so far under the influence of any drug, any combination of drugs, or a combination of one or more drugs and alcohol that the person could not drive a vehicle safely, while under the influence of a controlled dangerous substance, in violation of an alcohol restriction, or in violation of § 16–813 of this title;

2. Whether there was evidence of the use by the person of alcohol, any drug, any combination of drugs, a combination of one or more drugs and alcohol, or a controlled dangerous substance;

3. Whether the police officer requested a test after the person was fully advised of the administrative sanctions that

shall be imposed, including the fact that a person who refuses to take the test is ineligible for modification of a suspension or issuance of a restrictive license under subsection (n)(1) and (2) of this section;

4. Whether the person refused to take the test;

5. Whether the person drove or attempted to drive a motor vehicle while having an alcohol concentration of 0.10 or more at the time of testing; or

6. If the hearing involves disqualification of a commercial driver's license, whether the person was operating a commercial motor vehicle.

(ii) The sworn statement of the police officer and of the test technician or analyst shall be prima facie evidence of a test refusal or a test resulting in an alcohol concentration of 0.10 or more at the time of testing.

The statute further permits a sworn statement of the police officer attesting to the BAC level, as measured by an approved test instrument, to stand as prima facie evidence of the indicated BAC. § 16–205.1(f)(7)(ii). The MVA imposes sanctions for test results indicating an alcohol concentration of 0.10 or higher and for persons refusing to take the test. *See* COMAR 11.11.03.01 (stating that the administrative procedures established in that chapter govern sanctions imposed on drivers "who have refused a properly requested test or who have submitted to a test which showed a 0.10 or more alcohol concentration"). Actual blood alcohol content cannot be the basis for sanctions when an unwillingness to take the test triggers sanctions. Section 16–205.1(b)(i)(2) provides that for a first offense test refusal the MVA will suspend the driver's license for 120 days, and the MVA will impose a sanction of suspension for one year for a second offense test refusal. The administrative penalties for refusing to take the test are more severe than those imposed for test results indicating a BAC that exceeds the legal limit.

The language throughout the statutory scheme consistently frames the measurement of alcohol content in terms of the certified test result. The repetition of the phrase "while

having an alcohol concentration of 0.10 or more at the time of testing," when describing the offense, suggests that the result as determined by the test is the determinative element of the offense. No importance is given any other means of calculating alcohol content outside the final test instrument measurements of alcohol concentration. The Legislature chose a means for rendering an accurate reading of alcohol content and then drafted a statute creating procedures for taking the readings and imposing penalties based upon those readings. The provisions in the COMAR establishing the reliability of test results produced by the enumerated breathalyzer instruments further support the view that the test results are intended for administrative adjudication purposes to be an accurate measure of blood alcohol content, unless evidence is adduced that the specific machine employed in the specific driver's test was malfunctioning or the testing officer failed to follow the prescribed testing procedures in some meaningful way. Further, the procedures outlined in the Toxicologist's Regulations were designed to ensure the reliability of the test instruments and, subsequently, the reliability of the test results. Actual alcohol content is not at issue in an administrative hearing pursuant to § 16–205.1 because precautions have been taken by the Legislature to ensure that the testing process is fair to the tested person and to ensure that the most accurate result possible is rendered by the testing process.

The ALJ incorrectly determined that the language of § 16–205.1(b)(1), "or was tested and the result indicated an alcohol concentration of 0.10 or more," and the language of § 16–205.1(f)(7)(i)(5), "[w]hether the person drove or attempted to drive a motor vehicle while having an alcohol concentration of 0.10 or more at the time of testing," indicated that the Legislature intended to create an "alcohol content" statute. The ALJ's conclusions would be more justified if the statute omitted all language referring to testing and "the time of testing," and instead expressed the offense and the issue to be adjudicated at the hearing exclusively in terms of blood alcohol content. It is a cardinal rule of statutory interpretation

that the words of the statute are to be read so as not to create surplusage. The ALJ's interpretation of the statute, however, creates surplusage. To read the statutory language as basing sanctions on alcohol content rather than test results creates conflict between the intent of the statute and the provisions limiting the issues to be heard at the administrative hearing. If the intent of the statute is to impose sanctions based on actual alcohol content then the issues to be heard at the administrative hearings would include evidence of alcohol content other than the test results. The statutory scheme does not require the MVA to produce any evidence of intoxication other than the certified test results in order to make a prima facie case. It is, therefore, logical to conclude this is so because the statute intended sanctions be imposed based on test results.

Although the statute is plain and unambiguous when viewed as part of its overall statutory scheme, the legislative history also validates that it is a "test result" driven statute. The Senate Judicial Proceedings Committee explained in its Floor Report regarding House Bill 556 of 1989 that the administrative per se law was written to provide, in cases of drunk driving, "a swift penalty which is separate from any criminal penalties that may be imposed for the driving offenses." Floor Report, Senate Judicial Proceedings Committee, House Bill 556, at 2 (1989).

That the statute would be a "test result" statute is logical given the additional time and fiscal resources that would be required if an individual was permitted to challenge not only the alcohol concentration as evidenced by the test results, but otherwise could litigate the "actual" alcohol content of the person's blood stream at the time of the driving offense. A statement from the Governor's Legislative Office regarding proposed House Bill 556 stated that the bill would have the effect of "eliminating long delays through the criminal court process due to continuances, jury prayers, plea bargaining, and diversion programs before the offender encounters any appropriate sanctioning of his behavior. Individuals receiving a PBJ would not escape Administrative review of their fitness

to continue to operate on the highways." The statement further asserted that "[t]his bill would ensure immediate and certain sanctions by the Administration," and "speedy Administrative sanctions would help the offender to recognize the cause and effect relationship between the offense and the sanction which would otherwise be weakened by lengthy delays in the court processes." Governor's Legislative Office, "Positive Aspects of Administrative Per Se," House Bill 556 (1989).

A letter from the Lieutenant Governor to the Chairman of the Senate Judicial Proceedings Committee and the Chairman of the House Judiciary Committee expressed the following concerns about proposed House Bill 556:

In Amendment No. 13 of House Bill 556, the sworn statement submitted by an arresting officer and test technician would not be admissible if the officers were summoned to appear at the administrative hearing. The Administration is concerned that the wording of this Amendment would encourage every licensee to summon a police officer and technician as a tactical maneuver to bar the sworn statement from being admitted into evidence.

This could result in the required appearance of virtually every arresting officer and test technician in more than 26,800 hearings (based on 1988 arrest statistics). The cost to police agencies would be overwhelming. An estimated 174,000 man hours would be required for police officers at administrative hearings and the cost in overtime hours would exceed $4 million.

The provisions of House Bill 556, as amended, would cause serious problems in the scheduling of police officers to provide at least a minimum level of police protection to the public. In those areas of the State where police staffing is already at critically low levels, the wholesale summonsing of the officers could practically eliminate police protection. The cost in overtime to overcome the loss of manpower would also create an unreasonable burden for all of Maryland's police agencies. The projected degree of fiscal im-

pact would overwhelm the already high overtime expenditures that police are forced to utilize.

Under the current amendments, Maryland's law enforcement community would have neither the funds nor the personnel to adequately enforce the provisions of this bill. These projections, if they occur, might negate completely any possible benefit to highway safety that this bill was intended to make.

I understand that discussions have occurred with Chairman Horne and Administration officials and that there has been agreement that the language from page 11, line 36 to page 12, line 5 of House Bill 556 be amended to read as follows:

(II) 1. UNLESS THE PERSON HAS REQUESTED, AS REQUIRED UNDER THIS SECTION, A SUBPOENA TO BE ISSUED FOR THE POLICE OFFICER OR THE TEST TECHNICIAN OR ANALYST WHO PERFORMED THE TEST TO BE PRESENT AT THE HEARING, OR OTHERWISE COMPLY WITH THE SUBPOENA THE SWORN STATEMENT OF THE POLICE OFFICER SHALL AND OF THE TEST TECHNICIAN OR ANALYST SHALL BE PRIMA FACIE EVIDENCE OF A TEST REFUSAL OR A TEST RESULTING IN AN ALCOHOL CONCENTRATION OF 0.10 OR MORE AT THE TIME OF TESTING.

2. UNLESS THE PERSON HAS REQUESTED, AS REQUIRED UNDER THIS SECTION, A SUBPOENA TO BE ISSUED FOR THE POLICE OFFICER OR THE TEST TECHNICIAN OR ANALYST WHO PERFORMED THE TEST TO BE PRESENT AT THE HEARING, OR OTHERWISE COMPLY WITH THE SUBPOENA THE SWORN STATEMENT SHALL BE ADMISSIBLE IN EVIDENCE AND THE POLICE OFFICER AND TEST TECHNICIAN NEED NOT BE PRESENT OR GIVE TESTIMONY.

Letter from Hon. Melvin A. Steinberg, Lieutenant Governor, to Senator Walter M. Baker, Chairman, Senate Judicial Pro-

ceedings Committee, and Delegate William S. Horne, Chairman, House Judiciary Committee, at 2–3 (30 March 1989). These extracts from the bill file for House Bill 556 attest to the Legislature's intent to create procedures that would be an expedient and effective deterrent and sanction against drunk driving. They explicitly indicate an intent to limit the issues considered at resultant administrative hearings.

A key component of the "swift and effective" procedures created by the bill was the prima facie status given the test results indicating blood alcohol concentration. The test results were intended to be the basis for sanctions, assailable only on the basis of specific test instrument defects or meaningful test-giver error at the time of testing. The preamble to House Bill 556 enumerates the purposes of the Bill:

> For the purpose of altering the administrative sanctions for driving or attempting to drive under certain conditions involving alcohol; altering provisions relating to the implied consent to take certain tests; altering the penalties for refusing to take a test for alcohol and *establishing certain sanctions for certain test results.*

(Emphasis added.) The Department of Fiscal Services' Summary of Legislation described the legislation as "[a]lter[ing] the length of time a driver's license is suspended for a test result indicating an alcohol concentration of 0.10 or more at the time of testing," and "[e]stablish[ing] a new procedure for a police officer to follow in the event a person refuses to take the test for alcohol or *takes a test for alcohol which results in an alcohol concentration of 0.10 or more.*" Department of Fiscal Services, Revised Fiscal Note to House Bill 556, at 1 (1989) (emphasis added). The purpose was to establish the test results as the basis for sanctions, hence the administrative hearings, when requested, were to be as brief and expedient as due process permits.

Lytle places great weight on the *Haynes* case decided by the Supreme Court of Alaska. The court decided in *Haynes,* in the *absence* of legislative history, that, a statute providing that "a person commits the crime of driving while intoxicated

(DWI) if a breath analysis reveals that the person's breath sample contains 0.10 grams or more of alcohol per 210 liters of the person's breath," required the 0.01 margin of error to be applied to the test result in favor of the person taking the test. 865 P.2d at 754. The Supreme Court of Alaska reasoned that because the Alaska Legislature delegated authority to the Department of Public Safety to approve satisfactory techniques and methods of performing breath analysis of suspected drunk drivers, instead of taking it upon itself to select and approve the use of the Intoximeter 3000, the test instrument used to measure Haynes' BAC, there was no indication that the Legislature considered the 0.01 margin of error in crafting the statute. 865 P.2d at 755–56. The Alaska Supreme Court interpreted the statute to be an "alcohol content" statute and held that, "[a]bsent express legislative intent to the contrary, we hold that failure to apply the inherent margin of error of a particular testing device in favor of the person subject to license revocation violates due process of law as guaranteed by the Alaska Constitution." 865 P.2d at 756.

Two of the five members of the Alaska Supreme Court that decided *Haynes* dissented. The dissent rested on the basis that the statute was not ambiguous and should have been interpreted on its face by the majority: "I do not believe that it is right to say that a statute does not mean what it appears to mean because there is no legislative history indicating that the apparent plain meaning of the statute is the actual meaning. That is what today's opinion does." 865 P.2d at 757 (Matthews, J., dissenting). The dissent found it significant that the "discount approach" to test results adopted by the majority was not used by any other jurisdiction at that time. *Id.* The statute challenged in *Haynes* limited the issues to be considered at the hearing: "[t]he hearing under this section shall be limited to the issues of whether the arresting officer has reasonable grounds to believe that the person was driving a motor vehicle while intoxicated and whether (2) the chemical test ... produced a result described in AS 28.35.030(a)(2)." The dissent queried "one must ask why a legislature would enact a statutory scheme in which actual levels of alcohol are

critical and then preclude the state from employing non-test evidence which tends to prove that such levels exceeded legal limits in particular cases?" 865 P.2d at 759. In response to its own hypothetical question, the dissent stated that the majority's analysis was flawed because "the legislature probably intended that the critical element for license revocation was merely a failing test result." 865 P.2d at 760. The dissent further found fault with the majority's due process argument, stating "[g]iven my conclusion that a failing test result alone is the critical element in license revocation cases and that a driver's actual alcohol level is irrelevant," the conclusion that "it is a violation of due process not to consider a testing device's inherent margin for error is plainly wrong." 865 P.2d at 760.

Shortly after the Supreme Court of Alaska decided *Haynes,* the Alaska Legislature amended the statute to read as follows:

Except for an offense under AS 28.35.280, if an offense described under this title requires that a chemical test of a person's breath produce a particular result, and the chemical test is administered by a properly calibrated instrument approved by the Department of Public Safety, the result described by statute is not affected by the instrument's working tolerance.

Alaska Stat. § 28.40.060 (1996). *See Mangiapane v. Municipality of Anchorage,* 974 P.2d 427 (Alaska Ct.App.1999). The purpose and effect of AS 28.40.060 was to indicate that Legislature's unequivocal decision that "a .01 percent working tolerance was 'tolerably inaccurate,' and therefore, irrelevant to the driver's guilt under [the statute], and not in violation of state or federal due process rights." Alaska Stat. § 28.40.060 note (1996). *See Bushnell v. Alaska,* 5 P.3d 889 (Alaska Ct.App. 2000).

Lytle also cites to cases from Nebraska, Ohio, Hawaii, and Washington that applied the margin of error to breathalyzer test results. *See Nebraska v. Bjornsen,* 201 Neb. 709, 271 N.W.2d 839 (1978); *Washington v. Keller,* 36 Wash.App. 110, 672 P.2d 412 (1983); *Ohio v. Prestier,* 7 Ohio Misc.2d 36, 455

N.E.2d 24 (1982); *Hawaii v. Boehmer*, 1 Haw.App. 44, 613 P.2d 916 (1980). None of these decisions, however, actually fuel Lytle's jurisprudential engine. The Nebraska decision relied on by Lytle was overruled by *Nebraska v. Babcock*, 227 Neb. 649, 419 N.W.2d 527 (1988). Lytle mischaracterizes the position of the Hawaii courts. Lytle employs the *Boehmer* case to suggest that Hawaii law mandates giving the benefit of the margin of error to the defendant in a drunk driving case. In truth, the Supreme Court of Hawaii found that the error of margin is a relevant factor that may be considered at an administrative hearing, but it is only one factor to be weighed in determining whether it is "more probable than not" that the driver's BAC level was above the legal threshold. *Lara v. Tanaka*, 83 Hawai'i 24, 924 P.2d 192, 195 (1996). The Supreme Court of Hawaii held in *Lara* that, when the margin of error as applied to a BAC reading yielded a test result between the range of 0.097 and 0.117, the "hearing officer could conclude by a preponderance of the evidence in this case, including the margin of error, that it was more probable than not that Respondent 'had a blood alcohol content of .10% or more.'" *Id.*

A decision rendered by the Ohio Court of Appeals subsequent to the case cited and relied upon by Lytle, *Ohio v. Prestier*, 7 Ohio Misc.2d 36, 455 N.E.2d 24 (1982), held that the margin of error alone does not determine the accuracy of a driver's breath test. *Ohio v. Graham*, 1996 WL 612472, 1996 Ohio App. Lexis 4669. The Washington case Lytle cited, *Washington v. Keller*, 36 Wash.App. 110, 672 P.2d 412, 414 (1983), also does not support directly Lytle's proposition. In that case, the Court of Appeals of Washington held that the reputed margin of error in the breathalyzer was only one factor for the trier of fact to consider when determining whether the State met its burden of proving that the BAC indicated by the breathalyzer test was correct, and the test result alone is not conclusive proof of actual blood alcohol content. 672 P.2d at 413–14. Lytle is misguided to rely on the foregoing cases from other jurisdictions to support the proposition that the margin of error must be considered to

calculate an accurate BAC level and to further support the argument that Maryland's statute should be read as an "alcohol content" statute instead of a "test result" statute. The cases he lauds as favoring his reading of the statute at best support including the margin of error as but one factor for the administrative trier of fact to consider when making a determination of a person's BAC. They do not hold that the margin of error *must* be applied in *all* cases in favor of the person tested.

Lytle argues that a person has a property interest in his or her driver's license, *Dep't of Transp. v. Armacost,* 299 Md. 392, 474 A.2d 191 (1984), and therefore due process requirements apply to administrative proceedings affecting that property interest. Lytle reasons that the second of three factors set out by the United States Supreme Court in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976), "the risk of an erroneous deprivation of such [property] interest through the procedure used," when applied to his case, makes "clear that simply using the result of the Intox EC/IR breath test would create the risk of an erroneous deprivation of [his] property interest." If applied, the margin of error would have resulted in an actual blood alcohol concentration as low as 0.09, and Lytle would not have been "per se intoxicated" by law. Therefore, as his theory goes, any adverse action taken by the MVA to deprive him of his driver's license property right was violative of due process.

Lytle's argument has no merit. The due process clause functions to "protect interests in life, liberty and property from deprivation or infringement by government without appropriate procedural safeguards." *Coleman v. Anne Arundel County Police,* 369 Md. 108, 141–42, 797 A.2d 770, 790–91 (2002) (citing *Mathews,* 424 U.S. at 332, 96 S.Ct. at 901, 47 L.Ed.2d at 18). To establish a violation of due process, the aggrieved party must show that state action resulted in a deprivation of a property interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution or Article 24 of the Maryland Declaration of Rights. If a property interest is established then the court

must determine what procedures are required constitutionally before an individual may be so deprived. The procedures required are determined by balancing the individual and governmental interests affected by the property deprivation. *Armacost*, 299 Md. at 416, 474 A.2d at 203.

We have recognized that a driver's license is a property interest protected by both the Fourteenth Amendment to the U.S. Constitution and Art. 24 of the Maryland Declaration of Rights. 299 Md. at 418, 474 A.2d at 204. We also have stated that interpretations of federal procedural due process provisions by the Supreme Court are persuasive in our interpretation of Article 24. 299 Md. at 416, 474 A.2d at 203. The elements a court should take into consideration in balancing the private interest against the governmental interest were outlined by the *Mathews* court:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 334–35, 96 S.Ct. at 903, 47 L.Ed.2d at 33. In a case challenging the procedures provided by Maryland's Vehicle Emissions Inspection Program for appealing an adverse inspection result, or a revocation or non-renewal of registration, we reasoned:

> The second *Mathews* consideration is addressed to the risk of an erroneous determination under the procedures provided and the benefits to be gained from the substitution of alternative procedures. Where, as here, suspension decisions are largely automatic as based upon scientifically accepted objective criteria, and prompt post-suspension judicial review is available, the likelihood of erroneous administrative determinations is minimal. *See [Dixon v.] Love, supra,* 431 U.S. [105] at 113–14, 97 S.Ct. [1723] at 1727–

1728[, 52 L.Ed.2d 172]. Consequently, little is to be gained from provision of additional procedures.

*Armacost*, 299 Md. at 419, 474 A.2d at 204–05.

██ Lytle insists that due process is offended unless the 0.01 margin of error is factored into the calculation of a tested person's BAC before the person's driver's license is suspended. Essential to Lytle's argument is that the existing procedures for measuring blood alcohol content are inadequate and likely to result in the erroneous suspension of a person's driver's license. Interpreting the statute as an "alcohol content" statute requiring the margin of error to be factored into the final BAC reading would impose significant additional administrative and fiscal burdens upon the State. Actual alcohol content would be subject to determination at the administrative hearing and the State would be required to expend more time and resources proving the subject's BAC. Additionally, the statute would lose its per se quality and sacrifice its intended swift and expedient nature. The requirements that the test instruments be maintained and tested regularly and that the test administrator take the lowest of two or three readings rounded down to the second decimal place to arrive at the official "test result" as promulgated in the COMAR are intended to ensure the scientific accuracy of the certified test result used as evidence at the administrative hearing.

Our statement in *Armacost* is equally true when applied to the present matter. The statutory scheme makes suspension decisions relatively automatic, predicated upon "scientifically accepted objective criteria," and prompt post-suspension review is guaranteed by the provision of an administrative hearing. The suggested additional procedure would result in a burden on the State disproportionate to the benefits to the individual. The government has a significant interest in deterring drunk driving and in removing drunk drivers from the roads. Summary suspension of driver's licenses based on reliable test results exceeding the designated acceptable limit as measured by approved breath test instruments acts as a

deterrent and promptly removes the drunk driver from the roads. Lytle's due process argument fails.

***JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE DECISION OF THE MARYLAND OFFICE OF AD-MINISTRATIVE HEARINGS AND ORDER A NEW HEARING CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY RESPONDENT.***

APPENDIX

This is a duplicate of the Regulations of the Toxicologist, Post Mortem Examiners Commission, State of Maryland, Regarding Tests of Breath and Blood for Alcohol adopted October 1, 1995, as amended October 1, 1999. The Regulations were issued in 1983 and were reissued in 1990, 1995, and 2001 with amendments. The Regulations are appended to the Maryland DWI manual prepared by the Maryland State Police.

REGULATIONS OF THE TOXICOLOGIST
OFFICE OF THE CHIEF MEDICAL EXAMINER
POST MORTEM EXAMINERS COMMISSIONER
STATE OF MARYLAND
REGARDING TESTS OF
BREATH AND BLOOD FOR ALCOHOL

YALE H. CAPLAN, Ph.D., D–ABFT
TOXICOLOGIST

App. 1
STATE OF MARYLAND
DEPARTMENT OF POST MORTEM EXAMINERS
OFFICE OF THE CHIEF MEDICAL EXAMINER
111 Penn Street
Baltimore, Maryland 21201

TO WHOM IT MAY CONCERN:

The attached regulations are set forth pursuant to the responsibility charged to the Toxicologist of the Office of the Chief Medical Examiner, under the Post Mortem Examiners

Commission under Section 10–304 of the Courts and Judicial Proceedings Article, Annotated Code of Maryland.

These regulations are issued with regard to the training and certification of personnel performing tests of breath and blood for the purpose of determining the alcohol content in the body of drivers suspected of driving while under the influence of alcoholic beverages and the approval and certification of equipment used in conducting such tests.

These regulations supersede any previous regulations issued by this Office and are effective April 1, 1983.

Yale H. Caplan, Ph.D., D–ABFT
Toxicologist

App. 2
SECTION I
ALCOHOL TESTS GENERALLY

A. Definition of "percent by weight" in alcohol tests

Section 10–307 of the Articles of Courts and Judicial Proceedings (Chemical Tests for Intoxication–Results of Analysis and Presumptions) states that the results of chemical tests for intoxication be expressed as "percent by weight" of alcohol in the subject's blood as determined by an analysis of breath or blood. "Percent by weight" without any qualification is inexact. An exact scientific term would be either "percent, weight by volume" or "percent, weight by weight". In regard to chemical tests of breath or blood for alcohol in the State of Maryland, "percent by weight" is defined as "percent, weight by volume". This is further explained to be the weight of alcohol in grams contained in 100 milliliters (cubic centimeters) or blood. This method of reporting conforms to the Uniform Vehicle Code adopted by the American Medical Association to serve as a model for all states.

The breath testing devices are scientific instruments which determine the concentration of alcohol in a person's blood expressed as "percent by weight" (grams per 100 milliliters

of blood). It does this by analyzing a specific volume of expired breath. The weight of alcohol in the breath sample is determined and the quantity of the alcohol converted to its equivalent value in blood.

B. Radio Frequency Interference

A statistical study of the results of over 18,000 Validation Tests conducted on approximately 100 Breathalyzer Instruments (Model 800, 900 and 900A) during January 1, 1982 through September 30, 1982 indicates that common radio frequencies do not interfere with tests properly conducted in accordance with these Regulations.

C. Precision and Accuracy of Alcohol Tests

No scientific measurement is unequivocally precise. All such measurements have an accepted scientific range of accuracy. For the Breathalyzer and blood tests for alcohol, the accepted scientific range of accuracy is plus or minus 0.01% (one hundredth of one percent) of the reported result.

App. 3
SECTION II
TESTS OF BREATH FOR ALCOHOL (EVIDENTIARY)

A. Instrumentation

All instrumentation to be used in the State for the purpose of testing of breath for alcohol must be approved by the Toxicologist. Manufacturers of breath testing instruments may not offer for sale to police agencies instruments that have not been approved, and must report the sale of all such approved instruments to the CTAU. The CTAU will then advise the Toxicologist of such sale and purchase.

1. The Breathalyzer

The Breathalyzer, Models 800, 900 and 900A, as manufactured by Smith & Wesson Company/G.O.E.C., Pittsburgh, Pennsylvania or the Smith & Wesson Electronics Company, Eatontown, New Jersey;, or the Stephenson Corpora-

tion, Eatontown or Red Bank, New Jersey, are approved for chemical testing of breath for alcohol.

2. Other Breath Testing Instrumentation

 Other Instrumentation that may become available will be evaluated on an individual basis and a list of such approved instrumentation will be made available by the Toxicologist.

3. Breath Alcohol Simulation Equipment

 The Alcohol Breath Simulator, all models as manufactured by the companies listed in A.1. above are approved for use in conjunction with the breath testing instruments. Other Alcohol Breath Simulator devices will be evaluated on an individual basis and a list of such approved equipment will be made available by the Toxicologist.

4. Certification of Instruments

 All approved breath testing instruments must be certified by the Toxicologist prior to being used in the State, and all breath testing instruments will be recertified by the Toxicologist on a regular basis. Agencies will be notified

### App. 4

as to the date and time of such recertification. New instruments or instruments removed from the field for factory repair must be certified or recertified by the Toxicologist prior to being placed into or returned to service. Such certification or recertification shall be accomplished by forwarding a request to the CTAU, who shall notify the Toxicologist. Instruments which are repaired by a certified Breathalyzer Maintenance Technician may be returned to service without being recertified by the Toxicologist.

All certified instruments must be available for inspection by the Toxicologist or his representative at all times.

5. Instrument Test Ampoules

Certified Test Ampoules as distributed by the Smith & Wesson Company are approved for use in conjunction with the Breathalyzer instruments. A list of ampoules distributed by other manufacturers that are approved will be made available by the Toxicologist.

6. Instrument Calibration and Validation Standard

a. Alcohol Simulator Stock Solution will be prepared and certified by the Toxicologist and distributed to all participating Agencies by the CTAU.

b. The Alcohol Simulator Stock Solution shall be used to prepare the field Alcohol Breath Simulator solutions (Validation Test Solution) as follows: 10 mL of the Alcohol Simulator Stock Solution will be measured with a Class A volumetric TD pipette into a 500 mL Class A volumetric TC flask. Distilled water will be added to 500 mL. The mixture is then transferred into the Alcohol Breath Simulator (Breath alcohol simulated concentration is 0.100%).

7. Instrument Maintenance Tests

A certified Breathalyzer Maintenance Technician will perform a Simulator Test (Maintenance) on each certified instrument twice each month. The first test will be conducted between the first and the 15th day of each month. The second will be conducted between the 16th and the last day of each month.

## App. 5

These tests must be conducted using a freshly prepared Validation Test Solution (0.100%). The results of the test must not be less than 0.095% or greater than 0.105% using the 0.100% solution. Instruments failing to meet this tolerance must be removed from further use until repaired. Instruments which are repaired by a certified Breathalyzer Maintenance Technician to meet the above

tolerance may be returned to service by the Breathalyzer Maintenance Technician.

## B. Personnel

Requests for the training of Breathalyzer Operators or other personnel should be submitted in writing to the Supervisor, CTAU.