846 A.2d 1096

**HEARTWOOD 88, INC.**

v.

**MONTGOMERY COUNTY, Maryland, et al.**

No. 02489, Sept. Term, 2002.

Court of Special Appeals of Maryland.

April 14, 2004.

334

338

K. Donald Proctor, Towson, for Appellant.

Scott R. Foncannon (Charles W. Thompson, Jr., County Atty., Karen L. Federman, Principal Counsel for Appeals, on the brief), Rockville, for Appellee.

Panel: HOLLANDER, ADKINS, JOHN J. BISHOP, JR., (Retired, specially assigned), JJ.

HOLLANDER, Judge.

This appeal requires us to construe the "Tax Sale" statute, codified in Title 14, Subtitle 8 of the Tax–Property Article ("T.P.") of the Maryland Code (1985, 2001 Repl.Vol.). The case involves a dispute between Heartwood 88, Inc. ("Heartwood"), appellant, and Montgomery County (the "County"),

appellee, with regard to a tax sale of real property conducted by the County, at which it mistakenly sold 331 properties to Heartwood for which the owners were not then delinquent in payment of their real property taxes. Upon discovery of the errors, the County refunded the purchase monies to Heartwood for all of the sales, along with interest at the rate of 8%. Nevertheless, Heartwood claimed that it was entitled to interest at the "redemption rate" of 20%, amounting to $208,648.17, because that is the rate that would have applied if the sales had been valid and the owners had redeemed their properties. Appellant also sought to recover statutory attorney's fees of $400 for each of the 331 properties, totaling $132,400, along with other expenses. The Circuit Court for Montgomery County rejected Heartwood's claims and ordered Heartwood to return the County's interest payment.

Heartwood poses two questions for our consideration:

I. Did the circuit court err in refusing to award Heartwood interest at the 20% redemption rate plus statutory attorney's fees and other expenses incurred?

II. Did the circuit court err in concluding that interest paid to Heartwood by Montgomery County was paid without legal authority and that the County was therefore entitled to judgment?

For the reasons discussed below, we shall affirm in part, reverse in part, and remand for further proceedings.

## FACTUAL SUMMARY [1]

In May 2000, the County advertised its annual sale of parcels of real property located in the County, for which the payment of property taxes was delinquent. The County's notice of sale stated:

The tax sale is open to the public. Prospective bidders should investigate the properties. There is no warranty, expressed or implied, that a property has a marketable title

---

1. In its brief, the County expressly accepted appellant's version of the facts.

or that it contains the area of land which it is said to contain; therefore, the purchaser assumes all risks in that regard. Purchasers will receive a certificate of sale as required by law.

*In the event a tax sale is subsequently invalidated, the tax sale purchaser, upon the surrender of the Tax Sale Certificate, will receive a refund of the amount paid at tax sale, including interest calculated at 8%. The County will pay no expenses associated with the sale or invalidation.* The list of delinquent taxpayers shown below may include taxpayers who paid their taxes since the list was submitted to the newspaper for publication, and does not necessarily mean that their taxes are still delinquent.

\* \* \*

During the advertising period, May 18th through June 8th [of 2000], properties will be removed from groups [of properties for sale] predicated on payments received from taxpayers. Therefore, the final newspaper advertisement on June 8th will list groups with fewer properties then were originally advertised.

\* \* \*

Pursuant to 1999 tax sale legislation, the County must establish a high-bid premium for all properties sold in groups and/or by a sealed bid process. This high-bid premium is 20% of the amount by which the bid exceeds 40% of the properties' full cash value. The high-bid premium is payable at the same time the successful bidder pays the tax sale amount.

The County will refund the high-bid premium, *without interest,* to the holder of the tax sale certificate on redemption of the property or to the plaintiff in an action to foreclose the right of redemption on delivery of a tax sale deed for the property for which the high-bid premium was paid. The high-bid premium is not refundable after the time required (under Section 14–833) for the filing of an action to foreclose the right of redemption, if there has been

no redemption and if an action to foreclose the right of redemption has not been filed within that time.

(Emphasis added).

Appellant participated in the tax sale, which was held on June 12, 2000. At that time, the County sold approximately 1,900 properties in twenty-four groups. The sale of the properties was organized by group to insure the sale of all properties, including those that were regarded as less desirable. Appellant was the high bidder for twenty of the groups, consisting of 1,385 individual properties.

Accordingly, on June 13, 2000, Heartwood paid the County the sum of $6,868,442.56. Of that sum, $3,934,555.09 represented the amount due for taxes, interest, and penalties. The remaining sum of $2,933,887.47 constituted a statutory, interest-free "high-bid premium." [2] Appellant's purchases were evidenced by a "Certificate Of Tax Sale," which the County tendered to appellant for all 1,385 properties. Each tax sale certificate provided, in pertinent part: "Upon redemption, the holder of this certificate will be refunded the sums paid on account of the bid price together with . . . interest and penalty . . . The interest and penalty will be computed at the rate of 8% and 12% per annum respectively from the date of the tax sale to the date of redemption, together with all other amounts specified by Section 14–813, Annotated Code of Maryland. . . ."

The County concedes that it "mistakenly offered [331] properties at the tax sale even though the taxes had been paid." According to Glenn Wyman, then Chief of the Treasury Division for the County's Department of Finance, it was Heartwood that first discovered that the County had sold properties for which the owners were not in arrears. Over a period of months, beginning in December 2000 and continuing through

---

2. As the County explained in its notice of tax sale, the "high bid premium" is refunded to the holder of the tax sale certificate "on redemption of the property or to the plaintiff in an action to foreclose the right of redemption or delivery of a tax sale deed for the property for which the high-bid premium was paid."

October 2001, the County verified that, as of the time of the tax sale on June 12, 2000, the delinquent taxes and other charges had already been paid by the owners of the 331 properties inadvertently sold by the County at the tax sale.

Accordingly, about ten months after the tax sale, in April 2001, the County refunded the sum of $1,276,522.42 to Heartwood, representing reimbursement for the purchase price for the 331 properties. The County also paid Heartwood interest in the amount of $83,621.22, calculated at the rate of 8%, consistent with the County's tax sale notice. In addition, the County refunded the high bid premium that Heartwood had paid, in the amount of $890,537.39, but without interest.[3]

Heartwood was not satisfied with the interest payment at the 8% rate. It claimed that, because the sale of 331 properties was void, it was entitled to interest at the County's redemption rate of 20%, amounting to $208,648.17, pursuant to T.P. § 14–848 and other statutory provisions. Therefore, Heartwood sought an additional $125,026.95 from the County. Further, appellant claimed it was entitled to statutory attorneys' fees of $400 for each of the 331 properties, totaling $132,400, plus expenses of $2475, pursuant to T.P. § 14–843.

On December 6, 2001, after the County refused to pay the additional sums claimed by Heartwood, appellant instituted suit in the Circuit Court for Montgomery County. Styled as a "Complaint For Declaratory Judgment And For Judgment That Tax Sales Were Void," appellant sued the County and Timothy Firestine, Collector of Taxes and Director of Finance for the County.[4] In its suit, appellant asked the court to

---

3. Appellant does not challenge the County's failure to pay interest on the high-bid premium. *See* T.P. § 14–817(b)(2)(v).

4. Prior to the institution of suit, the County agreed that it was not necessary for appellant to join the property owners as parties. In a letter of July 20, 2001, to counsel for Heartwood, the County said:

 [W]e accept your offer to bring a single action in which only the County (and not the record title holders) would be joined as a defendant. The County agrees that it will not raise as a defense in any such suit that the record title owners have not been joined as

declare void the sales of the 331 properties; to order the County to pay interest at the redemption rate of 20%; and to require the County to pay attorneys' fees of $400 per property, along with costs. The County filed a counterclaim and request for declaratory judgment, seeking to recover the 8% interest that it had previously paid to Heartwood.

Following a hearing in October 2002 on the parties' cross-motions for summary judgment, the circuit court issued a written "Opinion and Order" on December 18, 2002, in which it granted judgment in favor of the County and Firestine. Noting that the parties "agree that the sale of the 331 properties in question was void at the time of the tax sale . . .", the court ruled that Heartwood was not entitled to the requested relief of interest on the refund at the redemption rate of 20%, statutory attorneys' fees, and expenses. The court said: "Simply put, in order for [Heartwood] to recover interest at the redemption rate, there must be a redemption of the property by the owner." In its view, "[t]here was no redemption with regard to the 331 properties at issue . . . because the sale was void from its inception," and thus the properties were "never subject to redemption." As "there was no sale for the court to void," the court determined that T.P. §§ 14–848 and 14–843 had no application here.

Moreover, the court determined that appellant was obligated to reimburse the County in the amount of $83,621.22, representing the 8% interest that the County had previously paid to appellant. The court reasoned that the tax collector "did not have the authority to pay 8% interest because no statute applied to the void tax sale," and such payment "was in violation of law." While acknowledging "a clear representation" that the County would pay interest at 8% for an invalid sale, and noting that "the three elements of equitable estoppel would appear to be met," the court nonetheless pointed out

parties and that more than ten certificates have been joined in a single proceeding.
The parties have not identified Firestine as a party to this appeal.

that the doctrine of equitable estoppel "has limited application against municipalities."

The court concluded that "[t]he doctrine of equitable estoppel does not prevent the County from [obtaining] reimbursement of the 8% interest paid in error." It reasoned that, as against a municipality, the doctrine, "*when applicable, must be bottomed on the need for the interpretation or clarification of an ambiguous statute or ordinance ...*" (Citation omitted)(emphasis in court's opinion). Satisfied that "there is no ambiguous statute or ordinance that is subject to interpretation," the court rejected appellant's argument that the County was "subject to estoppel because the County and the Tax Collector were following a long-standing administrative interpretation...." Rather, the court was of the view that "the common law rule of caveat emptor applies to tax sales."

We shall include additional facts in our discussion.

## DISCUSSION

### I.

Pursuant to Article XI–A of the Maryland Constitution, known as the "Home Rule Amendment," counties that opt to adopt a home rule charter for purposes of local governance are able "to achieve a significant degree of political self-determination." *Tyma v. Montgomery County,* 369 Md. 497, 504, 801 A.2d 148 (2002); *see McCrory Corp. v. Fowler,* 319 Md. 12, 16, 570 A.2d 834 (1990). The "Express Powers Act," Md. Ann.Code (1957, 1998 Repl.Vol., 2001 Supp.), Article 25A, is "the legislative response ... to the directive contained in § 2 of Article XI–A" of the State Constitution, which required the General Assembly "to provide a grant of express powers for charter home rule counties." *Tyma,* 369 Md. at 505, 801 A.2d 148.

Montgomery County is a charter or home rule county. Therefore, it exercises the express powers granted to it by State law, *Tyma,* 369 Md. at 505, 801 A.2d 148, which means that it enjoys "full legislative power ... to pass all ordinances" that it "deem[s] expedient under the police power ...," sub-

ject to the laws of the State and the provisions of Article 25A. *Tyma*, 369 Md. at 506, 801 A.2d 148. These express powers include the right "[t]o provide for the prompt collection of all taxes due the county; and for the sale of real estate, as well as leasehold and personal property, for the payment of the same." Code, Art. 25A, § 5(*O*). However, as noted, there are limitations on a home rule county's legislative power. Under Section 5(S) of the Express Powers Act, for example, a charter county may not enact an ordinance that conflicts with State law. *Tyma*, 369 Md. at 505–06, 801 A.2d 148.

 Tax sales of real property "are concerned with the payment of taxes on land. . . ." *Lippert v. Jung*, 366 Md. 221, 229, 783 A.2d 206 (2001). The laws regarding tax sales reflect a blend of State and local governmental power. The State's Tax Sale statute authorizes the State's political subdivisions to sell real property located in their own jurisdictions, for which property taxes are in arrears. While the General Assembly has carefully crafted legislation that governs much of the process and procedure with respect to such tax sales, *see* T.P. §§ 14–808 to 14–863, the local subdivisions are entitled to set the redemption rate of interest that an owner must pay after a tax sale in order to recover the property sold at the sale. That rate, often referred to as the redemption rate, is considered "a matter of local concern." *Fish Market Nominee Corp. v. G.A.A., Inc.*, 337 Md. 1, 11, 650 A.2d 705 (1994).

As Heartwood explains, the effect of a properly conducted tax sale under the State's statutory scheme is to provide "interest-free financing" to local subdivisions for unpaid real estate taxes. Because the State's Tax Sale statute is at the center of this appeal, we begin with a review of the statute and its salient provisions, many of which are interrelated, as well as the pertinent Maryland rules.

Upon proper notice to the necessary parties, the Tax Sale statute authorizes a local tax collector to sell property at public auction if an owner's real property taxes are in arrears. *See* T.P. §§ 14–808; 14–817; *LaValley v. Rock Point Aero Sport Club, Inc.*, 104 Md.App. 123, 126, 655 A.2d 60, *cert.*

*denied*, 339 Md. 354, 663 A.2d 72 (1995). The statute also authorizes the tax collector to set the terms for conducting the tax sale. T.P. § 14–817 states:

### § 14–817. Sale at public auction.

(a) *Conduct of sale.*

\* \* \*

(4) The conduct of the sale shall be according to terms set by the collector, and published with a reasonable degree of specificity in the public notice of the tax sale, to ensure the orderly functioning of the public auction and the integrity of the tax sale process. . . .

Pursuant to County law, the Director of the Department of Finance must conduct the tax sale on the second Monday in June at an hour and place specified in a published notice. That notice is sent by the Department to the owners of property for which taxes remain unpaid. Montg. Co. Code § 52–36 (1994, as amended).

Under T.P. § 14–818, the person or entity who makes a tax sale purchase must pay to the municipality, no later than the day after the tax sale, "the full amount of taxes due on the property sold" at tax sale, "together with interest and penalties on the taxes, expenses incurred in making the sale, and the high-bid premium, if any." The remainder of the purchase price "remains on credit." *Fish Market*, 337 Md. at 4, 650 A.2d 705. In return, "[t]he purchaser . . . receives a certificate of sale, which is freely assignable." *Id.* (citing T.P. § 14–820, § 14–821).

The Tax Sale statute provides for a variety of events to occur after a properly conducted tax sale, some of which are in the alternative. An understanding of these alternative scenarios is important to this case. In general, they involve three categories: the first concerns the owner's right to redeem the property; the second involves the tax purchaser's right to foreclose on the property; the third concerns the time period applicable to the right to foreclose. We explain.

First, under T.P. § 14–827, the property owner has the right to redeem the property sold by the tax collector "at any time until the right of redemption has been finally foreclosed. . . ." To do so, T.P. § 14–828 requires the redeeming party to pay the tax collector the "total price paid at the tax sale for the property together with interest"; plus taxes, interest, and penalties paid by the certificate holder; and taxes, interest, and penalties that have accrued since the date of the tax sale until the date of redemption. *See Fish Market,* 337 Md. at 4, 650 A.2d 705.

T.P. § 14–828(a) states, in part:

**§ 14–828. Required payments; interest rate on redemption; notice to holder of certificate; execution of certificate.**

(a) *Payments to collector.*—If the property is redeemed, the person redeeming shall pay the collector:

(1) the total price paid at the tax sale for the property together with interest;

(2) any taxes, interest, and penalties paid by any holder of the certificate of sale;

(3) any taxes, interest, and penalties accruing after the date of the tax sale. . . .

T.P. § 14–828(b) provides that the "interest rate on redemption" is "set under [T.P.] § 14–820." The sums referred to in T.P. § 14–828 are paid by the tax collector to the tax sale purchaser in exchange for the "surrender of the certificate of sale." *See* T.P. § 14–828(c). In *Fish Market,* 337 Md. at 5, 650 A.2d 705, the Court said: "If the property is redeemed, the holder, upon surrendering the certificate, receives the redemption amount paid to the collector, excluding taxes."

In addition, T.P. § 14–843 pertains to attorney's fees due "on redemption." It requires the redeeming party to pay attorney's fees of $400 for each property, plus expenses, to the certificate holder.

Pursuant to T.P. §§ 14–833 through 14–844, no sooner than six months from the date of the certificate of tax sale, but no

later than two years from that date, the certificate holder may file a complaint to foreclose the owner's right of redemption of the property. T.P. § 14–836 identifies the various parties to the proceedings. In particular, it denominates the holder of the certificate as the plaintiff and the record title holder of the property as one of the defendants. The form of a complaint to foreclose the right of redemption is governed by T.P. § 14–835 and Md. Rule 14–502. T.P. § 14–835(a)(3) and Rule 14–502(a)(3) both provide that the party filing such a complaint must state "that the property has not been redeemed by any party in interest."

Upon the filing of a complaint to foreclose, the court issues summonses to all defendants and an order to publicize the foreclosure proceeding. *See* T.P. §§ 14–839, 840; *Fish Market,* 337 Md. at 6, 650 A.2d 705. Until the court issues a final decree foreclosing the right of redemption, however, the owner's right of redemption continues. *Fish Market,* 337 Md. at 6, 650 A.2d 705. Moreover, in the event of a controversy as to the amount required for redemption, it is the court's responsibility to resolve that issue. *Id.*

T.P. § 14–842 is also significant, because it concerns a challenge to the validity of a tax sale. It provides:

**§ 14–842. Validity of taxes and sale presumed unless attacked in answer.**

In any proceeding to foreclose the right of redemption, it is not necessary to plead or prove the various steps, procedure and notices for the assessment and imposition of the taxes for which the property was sold or the proceedings taken by the collector to sell the property. *The validity of the procedure is conclusively presumed unless a defendant in the proceeding shall, by answer., set up as a defense the invalidity of the taxes or the invalidity of the proceedings to sell or the invalidity of the sale.* A defendant alleging any jurisdictional defect or invalidity in the taxes or in the proceeding to sell, or in the sale, *must particularly specify in the answer the jurisdictional defect or invalidity and must affirmatively establish the defense.*

(Emphasis added). *See also* Rule 14–505 ("Any issue as to the validity of the taxes, the proceedings to sell the property, or the sale, shall be raised by separate affirmative defense.").

In the event the owner fails to redeem the property by the specified date, the court issues a final decree foreclosing the right of redemption. T.P. § 14–844. Then, upon payment of any amounts that are due, the tax collector issues a deed to the tax purchaser. In this way, the tax purchaser acquires fee simple title to the property. *See Gordon Family Partnership v. Gar On Jer,* 348 Md. 129, 139, 702 A.2d 753 (1997); *LaValley,* 104 Md.App. at 127, 655 A.2d 60 (stating that "the purchaser acquires absolute title to the property."). As the Court said in *Lippert,* 366 Md. at 230, 783 A.2d 206: When there is "a valid tax sale and proper foreclosure of the equities of redemption," the prior title is terminated and a new title is created and "granted by the sovereign."

The certificate holder must file a proceeding to foreclose the right of redemption within two years from the date of the tax certificate. If the tax purchaser fails to do so, the sums paid by the tax sale purchaser for the tax certificate, including the high-bid premium, are forfeited. *See* T.P. § 14–817(b)(2)(vi); T.P. § 14–833(d); *Gordon Family Partnership,* 348 Md. at 137, 702 A.2d 753.

As we have seen, the tax sale purchaser is entitled to a certificate of tax sale. The content of the certificate of tax sale is prescribed by T.P. § 14–820(a). It states, in part: "The collector shall deliver to the purchaser a certificate of sale ... which ... shall set forth: ... (6) a statement that the rate of redemption is 6% a year, *except as provided in subsection (b) of this section....*" T.P. § 820(a) (Emphasis added). T.P. § 14–820(c) is also pertinent. It states:

§ 14–820. **Certificate of sale—In general.**

\* \* \*

(c) *Form of certificate.*—The certificate of sale shall be in substantially the following form: ... "On redemption the holder of the certificate will be refunded the sums paid on account of the purchase price together with interest at the

rate of 6% a year from the date of payment to the date of redemption (*except as stated in subsection (b) of § 14–820 of the Tax Property Article of the Annotated Code of Maryland*), together with all other amounts specified by Chapter 761 of the Acts of 1943, and acts that amend that chapter...."

(Emphasis added).

Both T.P. § 14–820(a) and T.P. § 14–820(c) provide for interest to the tax purchaser at the rate of 6%, *except as otherwise provided pursuant to T.P. § 14–820(b).* T.P. § 14–820(b) provides: "The rate of redemption is 6% a year *except:* ... (15) in Montgomery County the rate is 6% a year *or as fixed by a law of the County Council.*" (Emphasis added). Thus, T.P. § 14–820(b)(15) authorizes the Montgomery County Council to set the County's rate of interest payable on redemption.

The Montgomery County Council issued Resolution No. 9–1591 in December 1981, in which it declared, in part:

[T]he County Council ... believes that the tax sale of real property for overdue and unpaid ordinary taxes ... provides necessary government revenues; and the purchaser at tax sale is performing a service to the public. Therefore, the purchase of property at tax sale should be encouraged by providing that *the rate of redemption shall be the sum of the interest rate as provided in Section 48, Article 81, Annotated Code of Maryland, 1980 Replacement Volume, as amended, on late payment of delinquent taxes, and the penalty rate on late payment of delinquent taxes* as fixed by resolution of the County Council.

NOW THEREFORE BE IT RESOLVED by the County Council for Montgomery County, that commencing with the tax sale of real property in June 1982 for ordinary taxes overdue, in arrears and unpaid, in accordance with the provisions of Section 76 through 123, Article 81, Annotated Code of Maryland, *the rate of redemption shall be the sum of the interest rate on late payment of taxes as provided* in Section 48, Article 81, Annotated Code of Maryland, 1980

Replacement Volume, as amended, *and the penalty rate on late payment of delinquent taxes* as fixed by resolution of the County Council.

(Emphasis added).

The County's interest rate on delinquent property taxes is set at 8%, and its penalty rate is 12%. Therefore, the parties agree that the County's redemption rate (the combined rate of interest and penalties) is set at 20%.[5]

The Court of Appeals has recognized the policy reasons that undergird the rather high redemption rates that local governments typically establish in connection with properties sold at tax sales.[6] In *Fish Market*, 337 Md. at 5, 650 A.2d 705, it said:

Local subdivisions often set the [redemption] rate higher than rates given on ordinary investments. For example, Baltimore City has set the redemption interest rate at 24% per year.... This high rate of return encourages potential tax sale purchasers to invest in the property despite the fact that the property is subject to a right of redemption.

T.P. § 14–848 is central to this case. It provides:

---

5. The County admitted in its answers to interrogatories that its redemption rate is 20%. Moreover, when payment was made by the owners of the 331 properties, the County collected interest at 8% and the penalty of 12% on the taxes in arrears. *See* T.P. §§ 14–605 (interest); T.P. §§ 14–702 and 14–703 (tax penalty) and Montgomery County Code § 52–2(h) ("Ordinary taxes when overdue are subject to interest at the rate specified in state law. In addition to interest, taxes are also subject to a penalty at the rate established by resolution of the County Council").

6. As appellant points out, a redemption rate of 20% is not really tantamount to a return of 20%. The effective rate of interest for a tax sale purchaser is less than the redemption rate, because the General Assembly amended T.P. § 14–817(b) to permit counties to require tax sale purchasers to pay, in addition to the unpaid taxes, interest, and penalties, an interest-free "high-bid premium." The premium is equal to "20% of the amount by which the highest bid exceeds $40% of the property's full cash value." T.P. § 14–817(b)(2)(ii). Upon redemption, the County refunds the high-bid premium, but *without interest.* T.P. § 14–817(b)(2)(v). As appellant explains, "[t]his required interest-free posting has the effect of significantly reducing the investor's overall rate of return, while providing the County with additional capital at no cost, which the County either employs in its operations or reinvests."

### § 14–848. Judgment declaring sale void.

If the judgment of the court declares the sale void and sets it aside, the collector shall repay the holder of the certificate of sale the amount paid to the collector on account of the purchase price of the property sold, *with interest at the rate provided in the certificate of tax sale,* together with all taxes that accrue after the date of sale, which were paid by the holder of the certificate of sale or the predecessor of the holder of the certificate of sale, and all expenses properly incurred in accordance with this subtitle. . . .

(Emphasis added).

According to appellant, T.P. § 14–848 is the *only* provision in the Tax Sale statute that pertains to the circumstances of this case, involving the erroneous sale by the tax collector of properties for which no taxes were in arrears. In this situation, says appellant, T.P. § 14–848 requires the County to pay "interest at the rate provided in the certificate of tax sale," plus "expenses properly incurred in accordance with this subtitle. . . ." Although the County stated in its notice of sale that it would pay interest of 8% in the event of an invalid sale, appellant asserts that, in setting that amount, the County "simply misconstrued" T.P. § 14–848. In essence, Heartwood claims that the term "interest rate" really means the "redemption rate"—the sum of the interest and penalty rates of 8% and 12%, respectively.

As noted, T.P. § 14–848 provides for payment of interest to the tax purchaser at the rate provided in the certificate of sale, as well as payment of "all expenses properly incurred in accordance with this subtitle." T.P. § 14–843 governs those expenses. It provides, in part:

### § 14–843. Plaintiff or holder of certificate of sale reimbursed for expenses incurred.

(a) *In general.*—Except as provided in subsection (b) of this section, *on redemption,* the plaintiff or the holder of a certificate of sale is entitled to be reimbursed for expenses incurred in any action or in preparation for any action to foreclose the right of redemption. In addition, *the plaintiff*

*or holder of a certificate of sale, on redemption, is entitled to be reimbursed* for fees paid for recording the certificate of sale, *for attorney's fees in the sum of $400 for each certificate of sale,* for expenses incurred in the publication and service of process by publication, for reasonable fees for a necessary title search, *and for taxes, together with interest and penalties on the taxes,* arising after the date of sale that have been paid by the plaintiff. . . . *The plaintiff or holder of a certificate of sale is not entitled to be reimbursed for any other expenses.*

(Emphasis added).

T.P. § 14–832 is also noteworthy. It provides that T.P. §§ 14–832.1 through 14–854 "shall be liberally construed as remedial legislation to encourage the foreclosure of rights of redemption by suits in the circuit courts. . . ." Further, T.P. § 14–834 is relevant. Titled "Jurisdiction of court," it states, in part:

The circuit court, on the filing of a complaint to foreclose the right of redemption, has jurisdiction to give complete relief under this subtitle, in accordance with the general jurisdiction and practice of the court, and with all laws and rules of court that relate to the circuit courts for the county in which the property is located, except as otherwise provided in this subtitle. . . .

T.P. § 14–851 concerns the repeal of inconsistent acts and states, in part:

Any act, whether public general or public local, inconsistent with the provisions of Parts I through III of this subtitle, is repealed to the extent of the inconsistency; but all laws repealed by this subtitle shall nevertheless remain in force in respect to any tax sale made or instituted before December 31, 1943. Any tax sales made or instituted after December 31, 1943, shall be made only in accordance with the provisions of Parts I through III of this subtitle. . . .

## II.

Both sides have presented cogent, multifaceted arguments in support of their diametrically opposing positions.

Heartwood claims that T.P. § 14–848 governs the resolution of this case, because it pertains to a tax sale that is void, and these sales were void since the owners had paid their delinquent taxes prior to the tax sale. The underlying premise of Heartwood's position is its view that the "purpose of [T.P.] § 14–848 is to place the tax sale purchaser in the same position [it] would have been in had the sale [of the 331 properties] been properly conducted." Therefore, Heartwood contends that the properties in issue were subject to a redemption rate of 20%, and the court erred in failing to award Heartwood interest at the redemption rate of 20%. In addition, Heartwood contends that it was entitled by statute to recover attorneys' fees of $400 for each of the 331 properties in issue, because statutory attorney's fees are an "expense" under T.P. § 14–843 and, under T.P. § 14–848, the County is liable for "all expenses properly incurred in accordance with this subtitle . . . ."

Appellant observes that, "if the payment of the taxes on these properties had not been discovered until after actions to foreclose the right of redemption had been brought and served on the property owners, those property owners would have sought, and been entitled to the entry of, orders declaring the sales void." In that circumstance, says appellant, the sales would have been voided and then they would have fit squarely within T.P. § 14–848. In its view, this case is conceptually indistinguishable from the hypothetical outlined above. It matters not, insists Heartwood, that the errors were discovered prior to the filing of an action to foreclose, so that the sales were deemed void without the necessity of legal action by the owners or the parties.

According to Heartwood, because the County refused to recognize its statutory responsibility under T.P. § 14–848, Heartwood had the right to initiate legal action to obtain a judicial determination that the sales were void. Appellant maintains that its position is consistent with the view expressed by the County Council that the tax sale purchaser performs "a service to the public" and such activities "should be encouraged." To that end, appellant observes that T.P.

§ 14–832 expressly requires liberal construction of the statute, and T.P. § 14–834 confers "broad jurisdiction" on the circuit court in these kinds of matters. Therefore, Heartwood claims that, merely because the taxes on the 331 properties had "already been paid" at the time of the tax sale, and they were "void from their inception," this does not mean that "there was no sale for the court to void." Appellant asserts:

> To the contrary, if the payment of the taxes on these properties had not been discovered until after actions to foreclose the right of redemption had been brought and served on the property owners, those property owners would have sought, and been entitled to the entry of, orders declaring the sales void.

Appellant reasons that "there are many ... examples of sales which, in retrospect, are void from their inception, to which § 14–848 nevertheless applies." To illustrate, appellant points to sales for which the legal description in the notice of sale is erroneous, sales of properties that were omitted from the notice of sale, and sales of properties in which the owners go into bankruptcy. Appellant states: "Indeed, it is difficult to imagine an example of a void sale which is not, in retrospect, void from its inception." Thus, appellant argues:

> The fact that, in retrospect, these sales were void from their inception, cannot curtail the ability of Heartwood to institute an action to foreclose the rights of redemption in the properties. Heartwood still holds possession of the certificates of sale and was entitled, as it did in this proceeding, to institute actions to foreclose since it had not received all amounts it claims are due under the terms of the certificates and § 14–848.

Further, appellant contends that the limiting terms of the County's tax sale notice are without effect, because the County cannot contravene the provisions of T.P. § 14–848. Insisting that T.P. § 14–848 applies here, and authorizes payment of the redemption rate of 20%, appellant asserts:

> Surely, the General Assembly did not intend that the County could sell property on which no taxes were due, then

unilaterally declare the sale void, as the County seeks to do here, and thereby cut off the certificate holder's right to institute an action to foreclose the right of redemption so as to obtain the return of the amount deposited (with interest). To accept the circuit court's ruling would produce this result, however. The logical extension of the Court's conclusion that § 14–848 does not apply is that the County, in spite of its concession, was not required to refund the deposit amount either. Such an absurd result cannot be countenanced. . . .

The County vigorously disagrees with appellant. It presents an argument that is sequential in nature.

While conceding that it "mistakenly offered" the 331 properties at the tax sale, because the owners had already paid their overdue taxes, the County nevertheless claims that T.P. § 14–848 was never triggered. It reasons that, because the owners of the 331 properties had paid their delinquent taxes prior to the tax sale, they never had to redeem their properties. As there was no basis for the owners to redeem their properties, the County argues that Heartwood had no basis to file an action to foreclose the right of redemption. In the absence of a foreclosure action, says the County, the court had no basis to declare the tax sales void. And, absent such a judicial determination, the County contends that the remedies in T.P. § 14–848 "never became available to Heartwood."

The County asserts: "To read the statute to encompass a sale that should not have occurred because the taxes were paid, defies common sense. Heartwood's construction of the statute fails to comply with Maryland's statutory construction principles." In its view, "Heartwood knew the risks associated with purchases of property at tax sale and cannot realistically argue that the Legislature intended a profit in these unusual circumstances."

According to the County, there are only "two situations in which a purchaser of property at a tax sale receives expenses and interest on the purchase price as a remedy-when an owner redeems the property, and when a court declares a sale

void in the course of a suit to foreclose redemption." In its view, "[n]either situation existed in the present case." The County states:

> The General Assembly has accounted for the possibility that an owner may redeem the property at any time before a purchaser obtains a court order and a deed that forecloses the right of redemption. The Legislature also has provided a remedy for those instances in which a purchaser seeks to foreclose the right of redemption, but the court declares the tax sale to be void. In [only] these two situations, the purchaser at the tax sale enjoys remedies beyond the return of the purchase price.

Moreover, the County maintains that "the tax collector has no power to sell the property unless the taxes remain unpaid." Because the taxes were paid prior to the sale, the County claims that all 331 sales were "null and void." In this regard, the County argues that it has the independent authority to invalidate and declare "void" the 331 sales, without paying the sums that might otherwise be required under T.P. § 14–848.

Appellee adds that "the court reasonably may infer that the absence of a clear remedy reflects consideration and rejection of a remedy for the situation that occurred in this case." The County states: "Absent a clear statutory provision that provides a remedy, common law remains in effect," including the doctrine of *caveat emptor*. In the County's view, "[u]nder applicable common law principles, the County had to return only the purchase price and the high-bid premium to Heartwood." Further, the County argues that "[t]he payment of interest derives solely from statute, so the circuit court correctly ordered Heartwood to return the interest to the County based on the absence of a statutory remedy for the circumstances of this case."

Appellee also contends that the plain language of the statute does not provide for reimbursement of legal fees or expenses, except in the case of redemption by the owner or by judicial order in an action to foreclose the right of redemption. As

neither event materialized, the County claims that appellant cannot recover legal fees or expenses.

## III.

"[A] tax sale of property on which taxes have been paid is invalid." *Bugg v. State Roads Com.,* 250 Md. 459, 461, 243 A.2d 511 (1968); *see Jannenga v. Johnson,* 243 Md. 1, 8, 220 A.2d 89 (1966); *Mullen v. Brydon,* 117 Md. 554, 559, 83 A. 1025 (1912). Because the delinquent taxes for the 331 properties in issue had actually been paid by the time of the tax sale, the parties agree that the sales of the 331 properties were invalid and void at the time of the sale. Heartwood apparently recognizes that, as a predicate to obtaining the remedies contemplated by T.P. § 14–848, it must secure a judicial determination that the tax sales were void. Appellant insists, however, that, even though the 331 sales were void at their inception, it was entitled to obtain a judicial declaration pronouncing the sales as void. Then, according to Heartwood, it could invoke T.P. § 14–848 and require the County to pay the remedies prescribed by that provision.

To be sure, appellant did not receive the monies it anticipated from the tax sale. Given the County's error in regard to the sale of the 331 properties, the question remains whether the County was legally obligated to pay Heartwood the redemption rate of 20%, plus statutory legal fees and expenses, to make appellant whole. The principles of statutory construction frame our analysis.

It is well settled that the interpretation of a statute is a judicial function, *Muhl v. Magan,* 313 Md. 462, 481–82, 545 A.2d 1321 (1988), and requires us to determine and effectuate the legislature's intent. *Consolidated Construction Services, Inc. v. Simpson,* 372 Md. 434, 456, 813 A.2d 260 (2002); *Liverpool v. Baltimore Diamond Exchange, Inc.,* 369 Md. 304, 316, 799 A.2d 1264 (2002); *Mayor & City Council of Baltimore v. Chase,* 360 Md. 121, 128, 756 A.2d 987 (2000); *see also State v. Bell,* 351 Md. 709, 717, 720 A.2d 311 (1998); *Board of License Comm'rs v. Toye,* 354 Md. 116, 122, 729 A.2d 407

(1999). We are guided in this endeavor by the statutory text. *Huffman v. State,* 356 Md. 622, 627–28, 741 A.2d 1088 (1999); *Gordon Family Partnership,* 348 Md. at 137, 702 A.2d 753; *State v. Pagano,* 341 Md. 129, 133, 669 A.2d 1339 (1996).

We give the words of a statute their ordinary and usual meaning. *Ridge Heating, Air Conditioning and Plumbing, Inc. v. Brennen,* 366 Md. 336, 350, 783 A.2d 691 (2001); *Lewis v. State,* 348 Md. 648, 653, 705 A.2d 1128 (1998). If the statute is not ambiguous, we generally will not look beyond its language to determine legislative intent. *Kaczorowski v. Mayor & City Council of Baltimore,* 309 Md. 505, 515, 525 A.2d 628 (1987); *Maisel v. Montgomery County,* 94 Md.App. 31, 37, 614 A.2d 1333 (1992). When a term or provision is ambiguous, however, we consider the language "in light of the ... objectives and purpose of the enactment." *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 75, 517 A.2d 730 (1986). In this regard, "we may ... consider the particular problem or problems the legislature was addressing, and the objectives it sought to attain." *Sinai Hosp. of Baltimore, Inc. v. Department of Employment & Training,* 309 Md. 28, 40, 522 A.2d 382 (1987). And, if we cannot glean the legislature's intent from "the statutory language alone, we may ... look for evidence of intent from legislative history or other sources." *Allstate Ins. Co. v. Kim,* 376 Md. 276, 290, 829 A.2d 611 (2003); *see Motor Vehicle Admin. v. Lytle,* 374 Md. 37, 57, 821 A.2d 62 (2003). For example, we may consult the dictionary when the legislature fails to define a statutory term. *See Dep't of Assessments & Taxation v. Maryland–Nat'l. Capital Park & Planning Comm'n.,* 348 Md. 2, 14, 702 A.2d 690 (1997).

Further, we are obligated to construe the statute as a whole, so that all provisions are considered together and, to the extent possible, reconciled and harmonized. *Curran v. Price,* 334 Md. 149, 172, 638 A.2d 93 (1994); *State v. Crescent Cities Jaycees Foundat., Inc.,* 330 Md. 460, 468, 624 A.2d 955 (1993). Where "appropriate," we interpret a provision "in the context of the entire statutory scheme of which it is a part."

*Gordon Family Partnership*, 348 Md. at 138, 702 A.2d 753. When, as here, a provision "is part of a general statutory scheme or system, the sections must be read together to ascertain the true intention of the Legislature." *Mazor v. State Dep't. of Correction*, 279 Md. 355, 361, 369 A.2d 82 (1977). Moreover, "[i]f reasonably possible," we read a statute "so that no word, phrase, clause or sentence is rendered surplusage or meaningless," *id.* at 360, 369 A.2d 82, or "superfluous or redundant." *Blondell v. Baltimore City Police Dep't.*, 341 Md. 680, 691, 672 A.2d 639 (1996); *see also Eng'g Mgmt. Servs., Inc. v. Md. State Highway Admin.*, 375 Md. 211, 224, 825 A.2d 966 (2003); *Lytle*, 374 Md. at 61–2, 821 A.2d 62; *Mayor & Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 551, 814 A.2d 469 (2002).

▮▮▮▮▮ In our effort to effectuate the legislature's intent, we may consider " 'the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.' " *Chesapeake Charter, Inc. v. Anne Arundel County Bd. of Educ.*, 358 Md. 129, 135, 747 A.2d 625 (2000) (citation omitted). But, courts may " 'not invade the function of the legislature' by reading missing language into a statute" to correct " 'an omission in the language of the statute even though it appeared to be the obvious result of inadvertence.' " *Graves v. State*, 364 Md. 329, 351, 772 A.2d 1225 (2001) (citation omitted). *See also Fisher and Utley v. State*, 367 Md. 218, 292, 786 A.2d 706 (2001) (Bloom, J., concurring and dissenting) (stating that courts "may not . . . supply missing language when there is a *casus omissus* in the legislative scheme by judicially creating a statutory provision that the legislature would probably have added if it had given any thought to the problem it had not addressed"). What the Court said in *Rylyns Enters.*, 372 Md. at 550, 814 A.2d 469, is pertinent:

> As noted, absurd results in the interpretive analysis of a statute are to be shunned. This Court stated in *D & Y, Inc. v. Winston*, 320 Md. 534, 538, 578 A.2d 1177 (1990), that "construction of a statute which is unreasonable, illogical,

unjust, or inconsistent with common sense should be avoided." (citations omitted). *See also Blandon v. State*, 304 Md. 316, 319, 498 A.2d 1195 (1985) ("[R]ules of statutory construction require us to avoid construing a statute in a way which would lead to absurd results."); *Erwin and Shafer, Inc. v. Pabst Brewing Co.*, 304 Md. 302, 311, 498 A.2d 1188(1985) ("A court must shun a construction of a statute which will lead to absurd consequences.").

Heartwood asserts that the legislative history supports its construction of the Tax Sale statute. The tax sale provisions first appeared in the 1902 version of the Maryland Code. The predecessor to T.P. § 14–848, Chapter 519 of the 1902 Laws of Maryland, stated:

> That where property is erroneously sold for taxes in any of the counties of the State of Maryland through an error in description, *or for any other reason*, that the parties purchasing said property at tax sales shall be entitled *to the same rate of interest* as if the sale were made in due and proper form, and whenever an error is discovered at any tax sale, as aforesaid, the County Treasurer or the Commissioners of any county in which there is no treasurer shall make payment to the purchaser of the property sold at said tax sale upon his transferring to them his certificate of purchase at such sale from any funds in their hands.

(Emphasis added).

The provision quoted above remained in effect until 1943. *See* Md. Ann.Code (1939), Article 81, § 200. Then, pursuant to Chapter 761 of the 1943 Laws of Maryland, the State's tax sale laws were again revised. The scheme set forth in Chapter 761, which is similar to the modern version of the statute, was modeled on Chapter 540 of the 1941 Acts. The 1941 legislation amended the Code of Public Local Laws for Baltimore City, and revised the text with regard to the matter of the payment of interest to a City tax sale purchaser in the event of an invalid tax sale.

The 1941 legislation contained in § 58K of Chapter 540 a provision titled *"Sale Deemed Invalid. Return of Purchase*

*Price."* It authorized the Baltimore City Solicitor to invalidate a sale and return the sum paid by the tax sale purchaser, *but without interest.* It stated:

When, in the opinion of the City Solicitor, any sale made under the provisions of this Act, was not validly made, for any cause whatever, the purchaser at any such invalid sale shall be refunded the full amount of purchase money paid by him on account of the said sale.

In addition, § 62S of Chapter 540 of the 1941 Acts provided:

If the final decree of the court declares the sale void and sets it aside, the holder of the certificate shall be repaid the amount paid to the Collector on account of the purchase price of the property sold, with interest thereon *at the rate of six per cent* per annum, together with all taxes and other municipal liens accruing subsequent to the date of sale, which were actually paid by the holder of the certificate of sale or his predecessor therein, and all expenses properly incurred in accordance with the provisions of the Act. The Collector shall proceed to a new sale of the property under the provisions of this Act and shall include in such new sale all taxes and other municipal liens which were included in said void sale, and all unpaid taxes and other municipal liens accruing subsequent to the date of the sale declared void.

(Emphasis added).

Notably, the portion of the 1941 enactment contained in § 58K was not incorporated into the State's 1943 law. Nor does such a provision appear in the current statute. Appellant suggests that the General Assembly's failure in 1943 to adopt the 1941 legislation for Baltimore City evidences the legislature's intent, and establishes that the County "has no authority to declare a sale void without paying the sums required by [T.P.] § 14–848."

The language of the 1943 Act resembles the text that is currently in effect. Chapter 761, § 90P of the 1943 Laws stated:

*If the final decree of the court declares the sale void and sets it aside, the holder of the certificate shall be repaid the*

*amount paid to the Collector on account of the purchase price of the property sold, with interest thereon* at the rate of six per cent per annum, together with all taxes accruing subsequent to the date of sale, which were actually paid by the holder of the certificate of sale or his predecessor therein, *and all expenses properly incurred* in accordance with the provisions of the sub-title. If the Collector shall have paid the claims of any other taxing agency or agencies he shall be entitled to a refund thereof from such taxing agency or agencies with interest at 6% per annum. The Collector shall proceed to a new sale of the property under the provisions of this sub-title and shall include in such new sale all taxes which were included in said void sale, and all unpaid taxes accruing subsequent to the date of sale declared void.

(Emphasis added).

The language set forth above remained in effect until 1985, when there was a general revision of the tax laws by the Code Revision Commission. At that time, however, only minor changes were made in the wording of the statute. *Compare* Annotated Code of Maryland (1951), Article 81, § 114, and Annotated Code of Maryland (1957), Article 81, § 116, with Chapter 8, 1986 Laws of Maryland (T.P. § 14–848) and the Revisor's Note to T.P. § 14–848 contained in the Tax–Property Article (1986).

T.P. § 14–848 was again revised by Chapter 825 of the 1986 Laws of Maryland. That legislation changed the rate of interest payable to a certificate holder in the case of a void sale from 6%, as enacted in 1943, to "the rate provided in the certificate of tax sale." According to appellant, that "change further emphasizes the intent to restore the purchaser at a void sale to the position he would have been in had the sale been proper and the property subsequently redeemed." While the statutory interest rates have changed over time, appellant points out that the Code revisions adopted in 1943, 1951, 1957, and 1985 have largely been ones of "style." *See* Revisor's Note to T.P. § 14–848 (1986). *See also* Md.Code Ann., Chap. 761 (1943); Md.Code, Art. 81 § 114 (1951); Md.

Code Ann., Art. 81 § 116 (1957); Md.Code., T.P. § 14–848 (1986).

 In our view, analysis of the statutory scheme as a whole exposes appellant's flawed construction of the statute. The legislative history of T.P. § 14–848 does not establish that the legislature intended the tax sale purchaser to recover the redemption rate from the local government under the circumstances attendant here. Indeed, considering that tax sale purchasers are regarded as performing a public service, it is hard to reconcile how appellant's position would comport with the public interest; the municipality that is meant to benefit from the tax sale would have to bear a hefty cost, ultimately at taxpayer expense. Moreover, we see no statutory or historical basis that would lead us to conclude that the legislature sought to protect or favor tax sale purchasers in the way that appellant suggests, by eliminating the risk associated with an error committed by the municipality. We explain further.

By its terms, for a tax purchaser to obtain the remedies provided by T.P. § 14–848, the court must "declare[ ] the [tax] sale void and set[ ] it aside. . . ." As noted, in an attempt to come within the ambit of T.P. § 14–848, appellant sought to obtain a judicial ruling that the 331 sales were void, although the parties agreed they were void at inception. Heartwood has not convinced us that the unusual situation presented here entitled it to such a judicial declaration.

The statute clearly recognizes that there may be invalid tax sales. In that event, a court is certainly empowered to declare a tax sale as invalid. For that to occur, however, the tax purchaser must first present to the court a complaint to foreclose the owner's right of redemption, T.P. § 14–833 et. seq., *and*, in response, the defendant must then file an answer alleging as an affirmative defense the "invalidity of the taxes or the invalidity of the proceedings to sell. . . ." T.P. § 14–842.

In this case, because the 331 owners had paid their delinquent taxes prior to the tax sale, redemption was not warranted. In turn, Heartwood was not statutorily entitled to file a complaint to foreclose, because it could not represent to the

court that "the property has not been redeemed," as required by T.P. § 14–835(a)(3). And, without a complaint to foreclose, the record owners had no grounds on which to file answers challenging the validity of the tax sales, as provided by T.P. § 14–842.

 Nor did Heartwood have a statutory right to insist that the court issue a judicial decree to declare the 331 sales as void, just so that it could bring itself within the purview of T.P. § 14–848. Put another way, Heartwood had no viable cause of action to foreclose the rights of redemption, which was a predicate to a judicial determination with regard to the validity of the tax sales. And, the plain language of T.P. § 14–848 establishes that, because the court did not declare void the sales of the 331 properties (and had no grounds to do so), appellant did not qualify for the remedies provided in T.P. § 14–848.[7]

 Even assuming, *arguendo*, that T.P. § 14–848 extends to the situation in the case *sub judice*, involving the County's mistaken sale of properties, we do not construe T.P. § 14–848 to authorize payment to Heartwood at the redemption rate of 20%. As we observed, the redemption rate is "a matter of local concern." *Fish Market*, 337 Md. at 11, 650 A.2d 705. In the County, the redemption rate represents the sum of the interest rate of 8% and the penalty rate of 12%, two distinct components. Indeed, the County's Certificate of Tax Sale clearly distinguishes between interest and penalties. It provides that, "[u]pon redemption," the certificate holder is entitled to a refund of the "sums paid on account ... together with interest and penalty.... The interest and penalty will be computed at the rate of 8% and 12% per annum respectively...."

---

7. We need not decide whether T.P. § 14–848 would have applied if it had been necessary for the parties or the property owners to seek a judicial determination declaring that the sales were void. That case simply is not before us.

The County's notice of the tax sale for June 12, 2000, is consistent with the notion that the interest rate is a separate element of the redemption rate. It stated, in part: "In the event a tax sale is subsequently invalidated, the tax sale purchaser, upon the surrender of the Tax Sale Certificate, will receive a refund of the amount paid at tax sale, including interest calculated at 8%."

Interestingly, while T.P. § 14–820(b) refers to the "rate of redemption," and the cases have recognized a "redemption rate" in regard to tax sales, see, e.g., Fish Market, 337 Md. at 5, 650 A.2d 705, the statute distinguishes between interest and penalties. To illustrate, T.P. § 14–843(a) refers to both "interest and penalties on the taxes" that the owner must pay to redeem the property. Similarly, in connection with a sale declared void by the court, T.P. § 14–848 expressly requires payment to the holder of the certificate of sale of "the amount paid to the collector on account of the purchase price of the property sold, with *interest* at the rate provided in the certificate of tax sale . . . ." (Emphasis added). Significantly, the legislature could have used the term "redemption rate," but it did not do so. In any event, it is clear that the County's certificate of tax sale provides for payment of "interest" at the rate of 8% and penalties at the rate of 12%, rather than interest at a single redemption rate of 20%.

With respect to the statutory attorneys' fees of $400 per property, appellant's contention is clearly at odds with the principles of statutory construction. T.P. § 14–843 expressly states that, "*on redemption,*" the holder of a certificate of sale is entitled to the statutory attorney's fees. Therefore, redemption is a condition precedent to the obligation to pay the statutory attorney's fees. Yet, no redemption occurred here. Therefore, there is no statutory entitlement to attorney's fees.

Moreover in contrast to T.P. § 14–848, which makes clear that "the collector" shall repay the tax purchaser if the sale is declared void, T.P. § 14–843 makes no mention of reimbursement by the collector. Instead, it contemplates payment for

the itemized expenses by the party seeking to redeem the subject property. Again, that did not happen here.

## IV.

Although we do not perceive a statutory basis for appellant's claim of entitlement to the redemption rate of interest, we agree with appellant's alternative argument that, based on the principles of equitable estoppel, it was entitled to recover interest from the County at the rate of 8%. Because the County represented in its notice of sale that it would pay interest at 8% in regard to any invalid sales, the circuit court erred in concluding that appellant had to reimburse the County for the 8% interest that the County had previously paid to appellant.

In its ruling, the circuit court concluded not only that there was no authority under the tax sale statute by which appellant was entitled to payment of interest from the County, but also that the doctrine of equitable estoppel did not apply to the County. In appellant's view, "it would be inconsistent with equity and good conscience and result in unjust enrichment of the County to require Heartwood to return such funds." Appellant states:

Heartwood paid a valuable consideration, $1,276,522.42 and the County used those funds for many months before returning them to Heartwood. The interest paid to Heartwood by the County represents both a payment for the County's use of Heartwood's funds as well as compensation for Heartwood's inability to realize the expected return on those funds, that is, the redemption rate of interest which would have been paid by property owners on redemption.

The County responds that equitable estoppel does not apply "to situations in which a government entity misinterprets a clear law." Rather, it asserts that equitable estoppel applies only "when a misconstrued provision is ambiguous or when a party has acquired vested rights." [8] Appellee maintains that,

---

8. Appellant points out that the County claimed below that appellant could not recover based on the theory of unjust enrichment, but did not

because "Heartwood knew the risks associated with purchase of property at tax sale," Heartwood "cannot realistically argue that the Legislature intended a profit in these unusual circumstances." Further, it states: "The applicable statute neither mentions this particular situation nor specifies that interest should accompany the refund to the purchaser. Under applicable common law principles, the County had to return only the purchase price and the high-bid premium to Heartwood."

In *Mona Elec. Co. v. Shelton*, 377 Md. 320, 334, 833 A.2d 527 (2003), the Court of Appeals defined equitable estoppel as follows:

> [E]quitable estoppel [is] "the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy."

(Citations omitted). *See also Jurgensen v. The New Phoenix Atlantic Condominium Council of Unit Owners*, 380 Md. 106, 843 A.2d 865 (2004); *Cunninghame v. Cunninghame*, 364 Md. 266, 289, 772 A.2d 1188 (2001); *Sycamore Realty Co., Inc. v. People's Counsel of Baltimore County*, 344 Md. 57, 63, 684 A.2d 1331 (1996).

■ As we explained in *Gregg Neck Yacht Club, Inc. v. County Commissioners of Kent County*, 137 Md.App. 732, 773, 769 A.2d 982 (2001), "[t]hree essential and related elements are generally necessary to establish equitable estoppel." They are, *id.:*

---

argue that equitable estoppel is inapplicable to the County. Appellant advanced an equitable estoppel claim, however, and the court considered the issue. Therefore, we shall address it. In contrast, because the County has not pursued its unjust enrichment claim on appeal, we decline to consider that issue.

1) voluntary conduct or representation; 2) reliance; and 3) detriment. *Markov v. Markov,* 360 Md. 296, 307, 758 A.2d 75 (2000). "Clearly ... equitable estoppel requires that the voluntary conduct or representation constitute the source of the estopping party's detriment." *Knill [v. Knill],* 306 Md. [527,] 535, 510 A.2d 546 [(1986)].

What the Court of Appeals said in *Creveling v. Gov't Employees Ins. Co.,* 376 Md. 72, 101–02, 828 A.2d 229 (2003), is also instructive:

The estopped party is therefore " 'absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed ... against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy.' " *Cunninghame v. Cunninghame,* 364 Md. 266, 289, 772 A.2d 1188 (2001) (quoting *Knill v. Knill,* 306 Md. 527, [534], 510 A.2d 546 (1986)) *see also* 16B Appleman § 9081, at 491–92 (noting that estoppel "refers to an abatement raised by law of rights and privileges of the insurer where it would be inequitable to permit their assertion. It necessarily implies prejudicial reliance of the insured upon some act, conduct, or nonaction of the insurer."). A party asserting the benefit of an estoppel "must have been misled to his injury and have changed his position for the worse, having believed and relied on the representations of the party sought to be estopped." *Rubinstein v. Jefferson Nat'l Life,* 268 Md. 388, 393, 302 A.2d 49 (1973). Wrongful or unconscionable conduct is generally an element of estoppel, see *Food Fair v. Blumberg,* 234 Md. 521, 532, 200 A.2d 166 (1964), but an estoppel may arise even when there is no intent to mislead, if the actions of one party cause a prejudicial change in the conduct of the other. *Bean v. Steuart Petroleum,* 244 Md. 459, 469, 224 A.2d 295 (1966). Equitable estoppel is comprised of three basic elements: " 'voluntary conduct' or representation, reliance, and detriment." *Cunninghame,* 364 Md. at 289–90, 772 A.2d 1188. The party arguing for an

estoppel bears the burden of proving the facts that create it. *Id.* at 289, 772 A.2d 1188.

As we have seen, wrongful or unconscionable conduct, on which a party relies to his detriment, is generally an element in the application of equitable estoppel. *Cunninghame,* 364 Md. at 289, 772 A.2d 1188; *Knill v. Knill,* 306 Md. 527, 534, 510 A.2d 546 (1986); *Liberty Mutual Ins. Co. v. American Auto. Ins. Co.,* 220 Md. 497, 501, 154 A.2d 826 (1959). But, equitable estoppel may also apply "even in the absence of any fraud or wrongful intent" to mislead, if the actions or the inaction of the party estopped " 'cause a prejudicial change in the conduct of the other.' " *Zimmerman v. Summers,* 24 Md.App. 100, 120–21, 330 A.2d 722 (1975) (citation omitted); *see Knill,* 306 Md. at 534, 510 A.2d 546.

Whether an estoppel exists " 'is a question of fact to be determined in each case.' " *Markov v. Markov,* 360 Md. 296, 307, 758 A.2d 75 (2000) (citation omitted). As this Court recognized in *Allstate Ins. Co. v. Reliance Ins. Co.,* 141 Md.App. 506, 515, 786 A.2d 27 (2001), *cert. denied,* 368 Md. 526, 796 A.2d 695 (2002), the question of estoppel is a question of fact because it involves "the assessment of conduct by one party and reliance by another." *Grimberg v. Marth,* 338 Md. 546, 556, 659 A.2d 1287 (1995); *see Travelers Indem. Co. v. Nationwide Construction Corp.,* 244 Md. 401, 414, 224 A.2d 285 (1966).

Ordinarily, equitable estoppel does not apply against the State in regard to governmental functions. *See, e.g., ARA Health Serv., Inc. v. Department of Public Safety and Corr. Serv.,* 344 Md. 85, 96, 685 A.2d 435 (1996) ("Ordinarily, the doctrine of estoppel does not apply against the State...."); *Alternatives Unlimited v. New Baltimore City Bd. of School Comm'rs.,* 155 Md.App. 415, 843 A.2d 252 (2004); *Marriott v. Cole,* 115 Md.App. 493, 508, 694 A.2d 123, *cert. denied,* 347 Md. 254, 700 A.2d 1215 (1997) (stating that the doctrine of estoppel "ordinarily does not apply against the State, or its agencies, with respect to performance of its governmental functions"). In contrast, in *Berwyn Heights v. Rogers,* 228 Md. 271, 279,

179 A.2d 712 (1962), the Court recognized that equitable estoppel may apply "to municipal, as well as private, corporations and individuals." *See also City of Hagerstown v. Hagerstown Railway Co.*, 123 Md. 183, 194–95, 91 A. 170 (1914). However, "[t]here is no settled rule in this country as to when, and under what circumstances, equitable estoppel is available against a municipal corporation." *Inlet Assoc. v. Assateague House Condominium Assoc.*, 313 Md. 413, 434, 545 A.2d 1296 (1988); *see Permanent Fin. Corp. v. Montgomery County*, 308 Md. 239, 247–48, 518 A.2d 123 (1986).

In *Inlet*, 313 Md. at 435, 545 A.2d 1296, the Court acknowledged that, "while municipal corporations are not exempt from application of equitable estoppel principles, 'in practice we have applied the doctrine more narrowly.'" (Citation omitted); *see Marzullo v. Kahl*, 366 Md. 158, 194, 783 A.2d 169 (2001); *Permanent Fin. Corp.*, 308 Md. at 249, 518 A.2d 123; *Gontrum v. Mayor & City Council of Baltimore*, 182 Md. 370, 376, 35 A.2d 128 (1943); *Anne Arundel County v. Muir*, 149 Md.App. 617, 636, 817 A.2d 938 (2003); *Levinson v. Montgomery County*, 95 Md.App. 307, 334–35, 620 A.2d 961, *cert. denied*, 331 Md. 197, 627 A.2d 539 (1993). As the *Inlet* Court explained, 313 Md. at 437, 545 A.2d 1296, a party "'dealing with officers and agents of a municipality is charged with knowledge of the nature of their duties and the extent of their powers ...'" Therefore, "such a person cannot be considered to have been deceived or misled by their acts when done without legal authority." *Id.* In that circumstance, the doctrine of equitable estoppel cannot "'defeat the municipality in the enforcement of its ordinances,'" or in its "required adherence to the provisions of its charter," merely because of "'an error or mistake committed by one of its officers or agents....'" *Id.* (citation omitted). *See Gontrum*, 182 Md. at 378, 35 A.2d 128 (stating that "no estoppel as applied to a municipal corporation can grow out of dealings with public officers of limited authority where such authority has been exceeded, or where the acts of its officers and agents were unauthorized or wrongful."); *Lipsitz v. Parr*, 164 Md. 222,

227–28, 164 A. 743 (1933); *Alternatives,* 155 Md.App. at 424–429, 463–66, 843 A.2d 252.

We explained in *Anne Arundel County v. Muir,* 149 Md. App. 617, 817 A.2d 938 (2003), that, with respect to equitable estoppel in regard to a municipality, " 'there must have been some positive acts by such officers that have induced the action of the adverse party' and '[i]t must appear . . . that the party asserting the doctrine incurred a substantial change of position or made extensive expenditures in reliance on the act.' " *Id.* at 636, 817 A.2d 938 (citation omitted). Again, we recognized that estoppel may apply to municipalities, stating, *id.* at 636–37, 817 A.2d 938:

> A municipality may be estopped to deny the actions of its officers when they were taken within the scope and course of their actual authority. *Lipsitz v. Parr,* 164 Md. 222, 227, 164 A. 743 (1933). *See also Marzullo v. Kahl,* 366 Md. 158, 196, 783 A.2d 169 (2001); *Inlet Assocs. v. Assateague House Condo. Assoc'n.,* 313 Md. 413, 435–36, 545 A.2d 1296 (1988); *Permanent Financial Corp. v. Montgomery County,* 308 Md. at 250, 518 A.2d 123. On the other hand, estoppel will not apply to an act of a municipal corporation's officer that is outside his actual authority, *see Gregg Neck Yacht Club v. Co. Comm'rs of Kent County,* 137 Md.App. at 775, 769 A.2d 982; *see also Maryland Classified Employees Assoc. v. Anderson,* 281 Md. 496, 501 (1977) n. 2, 380 A.2d 1032 (*citing Gontrum v. [Mayor & City Council of] Baltimore,* 182 Md. 370, 378, 35 A.2d 128 (1943)), or that is taken in violation of the law. *Marzullo v. Kahl,* 366 Md. at 196–97, 783 A.2d 169; *Permanent Financial Corp. v. Montgomery County,* 308 Md. at 250, 518 A.2d 123; *Gregg Neck Yacht Club v. Co. Comm'rs of Kent County,* 137 Md.App. at 775, 769 A.2d 982.

Here, the notice of sale did not constitute a contract. But, the acceptance of its terms through bidding resulted in an executory contract; the terms of sale contained in the advertisement became part of the sale contract. *White v. Simard,* 152 Md.App. 229, 244–45, 831 A.2d 517 (2003). *See*

*also Donald v. Chaney,* 302 Md. 465, 477–78, 488 A.2d 971 (1985)(in foreclosure sale, terms of sale contained in advertisement of sale became binding and enforceable upon ratification); *Restatement (Second) of Contracts ("Restatement")* § 28(2) (1981)("Unless a contrary intention is manifested, bids at an auction embody terms made known by advertisement, posting or other publication of which bidders are or should be aware, as modified by any announcement made by the auctioneer when the goods are put up"). By bidding on the property at the public sale, a bidder "offers" to purchase the property under the express terms advertised by the director of finance. In other words,

> "bidders are or should be aware of terms ... published or announced. A bid need not repeat such term[s]; it is understood as embodying them. Hence the bidder is held to the published or announced terms even though he may have neglected to read them or may have arrived at the auction after the announcement was made."

*Simard,* 152 Md.App. at 245, 831 A.2d 517 (*quoting Restatement* § 28 cmt. e).

▪ Thus, by agreeing to purchase almost 1,900 properties in 24 groups, Heartwood accepted the terms of the advertisement. Significantly, the County has never claimed that any of its agents exceeded their actual authority in regard to the terms of the sale by stating in the advertisement that, "[i]n the event a tax sale is subsequently invalidated, the tax sale purchaser, upon the surrender of the Tax Sale Certificate, will receive a refund of the amount paid at tax sale, including interest calculated at 8%." To the contrary, it contends that equitable estoppel does not apply when "a government entity misinterprets a clear law. Rather, the doctrine applies only when a misconstrued provision is ambiguous or when a party has acquired vested rights."

The County asserts it misinterpreted a "clear" law. In our view, the law was hardly clear. In electing to do business with the County, which would inure to the benefit of appellant and the County, Heartwood relied upon the County's repre-

sentations that invalidated sales would yield interest of 8% to tax purchasers. Those representations were consistent with the County's prior conduct and were made within the scope of authority. Indeed, Wyman acknowledged that, in previous cases where property was sold in error, the County refunded the amount paid at the tax sale, plus interest at 8%.

In *Permanent Financial,* 308 Md. at 241, 518 A.2d 123, Montgomery County issued a building permit for an office building in Silver Spring. Almost nine months later, after the shell of the building was complete, the County "suspended the building permit and issued a stop work order on the grounds that the building violated statutory height limitations, set-back requirements, and floor area ratio restrictions." *Id.* at 241–42, 518 A.2d 123. The developer appealed to the County Board of Appeals and applied for an exemption, but the Board denied relief. *Id.* at 242, 518 A.2d 123. We affirmed, but the Court of Appeals reversed. *Id.* It stated that two reasonable explanations existed regarding the definition of "nonhabitable structures," and the County's practice at the time the disagreement arose conformed to the appellant's interpretation of "nonhabitable structures." *Id.* at 251, 518 A.2d 123. The Court held that because the County had been allowing builders to continue pursuant to appellant's definition of "nonhabitable structures," principles of equitable estoppel barred the County from requiring Permanent Financial to remove the building's additional story. *Id.* at 252, 518 A.2d 123.

We believe the same rationale applies here. Therefore, we conclude that the County is estopped from refusing to pay the 8% interest on the invalid tax sales.

## V.

At the end of the court's eight page Opinion and Order of December 18, 2002, the court ordered appellant to return the interest previously paid by appellee and declared that appellant was not entitled to a return on the failed tax purchase.

However, the circuit court did not issue a separate Declaratory Judgment.[9]

■■■■■■■ The appellate courts have repeatedly said that, " 'when a declaratory judgment action is brought, and the controversy is appropriate for resolution by declaratory judgment, "the trial court must render a declaratory judgment." ' " *Information Systems and Network Corp. v. Federal Ins. Co.,* 145 Md.App. 457, 467, 805 A.2d 1141, *cert. denied,* 372 Md. 430, 813 A.2d 258 (2002) (quoting *Harford Mut. Ins. Co. v. Woodfin Equities Corp.,* 344 Md. 399, 414, 687 A.2d 652 (1997)) (quoting *Christ by Christ v. Maryland Dep't. of Natural Res.,* 335 Md. 427, 435, 644 A.2d 34 (1994)). In *Woodfin,* 344 Md. at 414–15, 687 A.2d 652, the Court said:

> "[W]here a party requests a declaratory judgment, it is error for a trial court to dispose of the case simply with oral rulings and a grant of . . . judgment in favor of the prevailing party." *Ashton v. Brown,* 339 Md. 70, 87, 660 A.2d 447 (1995), and cases there cited.

The fact that the side which requested the declaratory judgment did not prevail in the circuit court does not render a written declaration of the parties' rights unnecessary. As this Court stated many years ago, "whether a declaratory judgment action is decided for or against the plaintiff, there should be a declaration in the judgment or decree defining the rights of the parties under the issues made." *Case v. Comptroller,* 219 Md. 282, 288, 149 A.2d 6 (1959). *See also, e.g., Christ v. Department, supra,* 335 Md. at 435–436, 644 A.2d 34 ("[t]he court's rejection of the plaintiff's position on the merits furnishes no ground for" failure to file a declara-

---

9. On February 3, 2004, this Court remanded the case to the circuit court for entry of a separate judgment consistent with the requirements of Maryland Rule 2–601(a). On March 4, 2004, the circuit court issued an Order that, *inter alia,* entered judgment in favor of Montgomery County in the amount of $83,621.22 and denied appellant's claim for interest at the redemption rate. Unfortunately, in our Order, we did not specifically point out the circuit court's failure to issue a declaratory judgment, and that omission was not cured by the circuit court's Order of March 4, 2004.

tory judgment); *Broadwater v. State,* 303 Md. 461, 467, 494 A.2d 934 (1985) ("the trial judge should have declared the rights of the parties even if such declaration might be contrary to the desires of the plaintiff"); *East v. Gilchrist,* 293 Md. 453, 461 n. 3, 445 A.2d 343 (1982) ("where a plaintiff seeks a declaratory judgment ..., and the court's conclusion ... is exactly opposite from the plaintiff's contention, nevertheless the court must, under the plaintiff's prayer for relief, issue a declaratory judgment"); *Shapiro v. County Comm. [of Prince George's County],* 219 Md. 298, 302–303, 149 A.2d 396 (1959) ("even though the plaintiff may be on the losing side of the dispute, if he states the existence of a controversy which should be settled, he states a cause of suit for a declaratory decree").

*See also Jackson v. Millstone,* 369 Md. 575, 593–94, 801 A.2d 1034 (2002); *Ross v. Mayor and City Council of Baltimore,* 135 Md.App. 370, 379–80, 762 A.2d 974 (2000); *McBriety v. Commissioners of Cambridge,* 127 Md.App. 59, 63–4, 732 A.2d 296 (1999).

■ What the Court said in *Allstate Ins. Co. v. State Farm Mut. Auto. Ins. Co.,* 363 Md. 106, 117 n. 1, 767 A.2d 831 (2001), is also pertinent:

"Nor, since the 1997 amendment to Maryland Rule 2–601(a), is it permissible for the declaratory judgment to be part of a memorandum. That rule requires that '[e]ach judgment shall be set forth on a separate document.' *When entering a declaratory judgment, the court must, in a separate document, state in writing its declaration of the rights of the parties, along with any other order that is intended to be part of the judgment.* Although the judgment may recite that it is based on the reasons set forth in an accompanying memorandum, *the terms of the declaratory judgment itself must be set forth separately.* Incorporating by reference an earlier oral ruling is not sufficient, as no one would be able to discern the actual declaration of rights from the document posing as the judgment. This is not just a matter of complying with a hypertechnical rule. The requirement that the court enter its declaration in writing is for the

purpose of giving the parties and the public fair notice of what the court has determined."

(Emphasis added). *See also Bushey v. Northern Assurance Co.,* 362 Md. 626, 651–652, 766 A.2d 598 (2001); *Maryland Assn. of HMO's v. Health Services Cost Review Commission,* 356 Md. 581, 603, 741 A.2d 483 (1999).

Therefore, we shall remand this case to the circuit court for the entry of a declaratory judgment in conformity with this opinion.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY BY THE PARTIES.**